John CHAIKEN and Marilyn Chaiken,
Plaintiffs–Appellants,

v.

VV PUBLISHING CORP. d/b/a The Village Voice, Robert Friedman, Modiin Publishing House d/b/a Maariv, and Ron Dagoni, Defendants–Appellees.

No. 292, Docket 95–9301.

United States Court of Appeals,
Second Circuit.

Argued Nov. 26, 1996.

Decided July 21, 1997.

Louis Kerlinsky, Springfield, MA, for Plaintiffs–Appellants.

Elizabeth A. McNamara, New York City (Sharon L. Schneier, Lankenau Kovner & Krutz, LLP, New York City, on the brief), for Defendants–Appellees VV Publishing Corporation d/b/a The Village Voice and Robert Friedman.

Mark H. Jackson, New York City (Yuval H. Marcus, Squadron, Ellenoff, Plesent & Scheinfeld, LLP, New York City, on the brief), for Defendants–Appellees Modiin Publishing House, Ltd. and Ron Dagoni.

Before: WALKER and LEVAL, Circuit Judges, and STANTON,* Senior District Judge.

LEVAL, Circuit Judge:

In November of 1985, two articles written by defendant Robert I. Friedman appeared in the *Village Voice* (the *"Voice"*), a weekly newspaper published by defendant VV Publishing Corporation d/b/a The Village Voice ("VV"). These articles discussed the activities of Jewish terrorist groups operating in Israel's West Bank. In the lead article, entitled "In the Realm of Perfect Faith: Israel's Jewish Terrorists," Friedman described an afternoon he spent with plaintiffs John and Marilyn Chaiken who had emigrated from Massachusetts to Israel. This article quoted extensively remarks the Chaikens made to Friedman.

When Friedman's articles appeared in the *Voice*, defendant Ron Dagoni was the New York correspondent for *Maariv*, a Hebrew-language daily newspaper published in Israel by defendant Modiin Publishing House d/b/a Maariv ("Modiin"). Dagoni wrote an article that appeared in the November 7, 1985 edi-

* The Honorable Louis L. Stanton, United States Senior District Judge for the Southern District of New York, sitting by designation.

tion of *Maariv,* summarizing Friedman's articles.

In 1988, the Chaikens brought suit in Massachusetts state court, alleging that Friedman, VV, Modiin, and Dagoni had defamed them and intentionally inflicted emotional distress on them by publishing the articles. Defendants removed the case to the United States District Court for the District of Massachusetts, which dismissed for lack of personal jurisdiction the claims against Modiin and Dagoni and transferred the claims against VV and Friedman to the United States District Court for the Southern District of New York. Judge John F. Keenan thereafter dismissed the claims against Friedman, deeming them untimely under the New York statute of limitations. Following extensive discovery, Judge Shira A. Scheindlein granted VV's motion for summary judgment.

The Chaikens appeal. They argue that (1) the Massachusetts district court had personal jurisdiction over Modiin and Dagoni; (2) Judge Keenan erred in applying New York's statute of limitations instead of the Massachusetts statute; and (3) Judge Scheindlin made legal and factual errors in granting VV's motion for summary judgment.

We affirm.

### Background

#### A. The Parties and Facts

VV, a New York corporation, publishes the *Voice,* a weekly newspaper founded in 1955. The *Voice* features a variety of articles and columns covering such topics as politics, culture, and lifestyle. Over the years, the *Voice* and its writers have won a number of awards, including the Pulitzer Prize. The *Voice* has a weekly U.S. circulation of approximately 147,000 copies. Most of its stories, articles, and advertising concern topics relevant to New York City, where it makes the bulk of its sales.[1]

In November of 1985, over 81% of the *Voice*'s total circulation was within the New York City metropolitan area. At that time, sales and subscriptions in Massachusetts made up only 2% of its U.S. circulation, and the average paid circulation outside the United States and Canada was 256 copies.

Friedman, a New York resident, has been a journalist since June of 1980. He has never lived or worked in Massachusetts and has no property or financial dealings there. In 1983, David Schneiderman, then Editor-in-Chief of the *Voice,* interviewed Friedman and reviewed his work, including six articles published between 1979 and 1982 in leading newspapers such as the *Los Angeles Times,* the *New York Times,* and the *International Herald Tribune.* Satisfied with Friedman's qualifications, Schneiderman commissioned him to write for the *Voice.* Between 1983 and 1985, Friedman wrote eight articles for the *Voice,* whose editors found his work thorough and impressive. As of 1985, none of Friedman's articles—in the *Voice* or elsewhere—had been the subject of a lawsuit.

Friedman did not have a contract with the *Voice* and was paid "on submission." The *Voice* did not assign him topics; rather, he proposed ideas to a senior editor, who approved or rejected his choices, with Friedman retaining the copyright for any articles published in the *Voice.* If the *Voice* declined to publish an article, Friedman received a "kill-fee," typically between 25% and 50% of the full fee. Friedman was free to propose articles or ideas to other publications, and received most of his income between 1983 and 1985 from other literary sources. The *Voice* did not provide Friedman with fringe benefits or an office, did not withhold taxes, and did not list him on its masthead as a "staff writer."

In the spring of 1985, the *Voice* approved Friedman's proposal to write an article about an upcoming trial of members of the "Jewish underground" who had committed acts of violence against West Bank Arabs, and about the ideological and financial support they received from the American Jewish community. With funding from The Fund for Investigative Journalism, Friedman researched the article in Israel and the West Bank. In Hebron and a nearby Jewish settlement

---

1. As of April 16, 1996, the *Voice* began distributing copies free of charge in Manhattan. *See* Karen Durbin, *Steal This Paper!,* The Village Voice, April 16, 1996, at 3.

called Kiryat Arba, yeshiva students suggested that he interview the Chaikens because they spoke English. After introducing himself as a *Voice* reporter researching an article on Jewish settlers on the West Bank, Friedman spent an afternoon interviewing the Chaikens. Friedman took notes, but did not tape-record the interview. He had no telephone or mail contact with Massachusetts during preparation of the article, and none of his sources for the article reside there.

Friedman submitted a draft of his article to the *Voice* in the fall of 1985. A senior editor and the Editor of the *Voice* reviewed the article and suggested changes in structure and organization, but not in substance. Schneiderman then reviewed the article and questioned some technical facts, which were verified before publication. After copy-editing to verify spellings, dates, and sources of information, the *Voice*'s outside counsel reviewed the article. As was its practice, the *Voice* did not confirm quotations attributed to persons featured in the article.

The final version, entitled "In the Realm of Perfect Faith: Israel's Jewish Terrorists," was the cover story of the November 12, 1985 edition of the *Voice*. The front cover of the issue reads "INSIDE THE JEWISH TERRORIST UNDERGROUND: How Fanatic Nationalists Are Tearing Israel Apart." The article begins by describing Hebron, Kiryat Arba, and the settlers who live there. It says that about 65% of the settlers are "of American origin" and that "[m]ost are fervent supporters of the major right-wing religious-nationalist organizations" like Rabbi Meir Kahane's "avowedly anti-Arab Kach Party."

The article then introduces the Chaikens, referring to them by the names they use in Israel, Yona and Malka Khaykin. It explains that Yona is a "computer programmer with a master's in physics from MIT," that the Chaikens came to Hebron from Boston, Massachusetts, and that they live with their five children in the Casbah, "inside a heavily fortified compound, surrounded by wrought-iron gates and guarded by teenage yeshiva students who tote Uzi submachine guns."

The article then presents, through quotations and paraphrases, the Chaikens' views on the settlers' right to live on the land and to exclude Arabs. Friedman quotes Yona stating that Hebron is historically significant to the Jewish people and responding to those who deem it unethical to expel the Arabs: "Western European values are bullshit. The messiah will come. There will be a Jewish kingdom. Jews will be the spiritual bosses of the world. . . . You can't create a messianic Jewish state with 1.9 million Arabs!" Yona then "boasts" of deliberately provoking the Arabs into violence in the hope that the Israeli army will respond by driving the Arabs off the West Bank. Yona and Malka together recount that he and 50 armed settlers once burst into a Mosque during prayers, gave their son a ritual haircut, and then ate watermelon and spit the seeds all over the floor.

In the next paragraph, Malka says that "you have to live in the realm of perfect faith" and suggests that Jews massacred by Arabs in Hebron in 1929 brought it upon themselves because their "faith was imperfect, and because they had sex with Arabs." Friedman then describes a walk with Malka through Hebron's Casbah, where she slaps an Arab child selling combs in front of a place where a Jewish settler was murdered. Friedman then quotes Malka and Yona vilifying Arabs.

The next paragraph begins with the article's last mention of the Chaikens: "Settlers like the Khaykins have turned the more than 114 settlements that now dot the West Bank into hothouses for the growth of terrorism." It then reports that Israeli authorities have recently uncovered six different Jewish undergrounds responsible for terrorist bombings and murders of Arabs across the West Bank and that the two largest of these groups are affiliated with the Gush Emunim settlers movement and the Kach Party and continue to enjoy widespread support from Israeli society. The next paragraph quotes an expert on West Bank affairs: "One day the settlers who support Gush Emunim or Kahane will commit an atrocity so grave that it will imperil Jews everywhere."

The remaining five pages of the article treat more broadly the topic of terrorism

among settlers in the West Bank. These pages discuss various Israeli terrorist groups and give profiles of West Bank settlers involved in terrorist activities, describing in detail their attempts to bomb and kill Arab residents and officials. A companion article by Friedman, "The American Connection," details American–Jewish support for hard-line organizations.

In November of 1985, Dagoni, an Israeli citizen living in New Jersey, was *Maariv*'s New York correspondent. He never lived, owned property, or transacted any business in Massachusetts. He never travelled to Massachusetts on business and communicated with research sources in Massachusetts only once in four years.

Late on the evening of Tuesday, November 5, 1985, Dagoni purchased in Manhattan a copy of the November 12, 1985 edition of the *Voice*, which had just hit the newsstands. After reading Friedman's piece, he returned to his home in New Jersey and wrote an article derived entirely from it. On November 6, 1985, Dagoni "communicated" his article, which quoted extensively from Friedman's descriptions of the Chaikens, from New Jersey to Tel Aviv, Israel. This article appeared in *Maariv* on Thursday, November 7, 1985.

Modiin publishes *Maariv*, the second-largest daily newspaper in Israel. Published in Hebrew, its average daily circulation between 1985 and 1988 ranged from 100,000 to 112,000 copies. During that period, *Maariv* sent to subscribers in Massachusetts four copies of its weekday edition, which is not sold at newsstands there. *Maariv*'s Sunday edition has a circulation of about 215,000 copies, of which 183 copies are sold in Massachusetts through subscriptions and newsstands. *Maariv* does not advertise or solicit subscribers or advertisers in Massachusetts. Its gross revenues from Massachusetts distribution are $411.75 per week. From 1985 to 1988, it received a total of $160.00 in advertising revenues from Massachusetts.

Modiin owns no property in Massachusetts and has no agents or employees there. Between 1985 and 1989 its only news-gathering in Massachusetts was one visit in 1988 to cover the Dukakis campaign and occasional calls to the Israeli consulate. *Maariv* used no Massachusetts sources in connection with Dagoni's article.

## B. Proceedings Below

On November 4, 1988, the Chaikens brought this action in Massachusetts state court. The complaint alleges that VV, Friedman, Modiin, and Dagoni defamed the Chaikens and caused them emotional distress by falsely portraying their attitudes and conduct toward Arabs living in the West Bank. It alleges damage to their reputations and careers.

Invoking diversity jurisdiction, VV and Modiin removed the action to the District Court for the District of Massachusetts. All defendants but VV then moved to dismiss for lack of personal jurisdiction.

In a Report and Recommendation dated January 10, 1990, Magistrate Judge Michael A. Ponsor found that the Massachusetts long-arm statute authorized jurisdiction over all defendants, but that exercising jurisdiction over Modiin and Dagoni would violate the due process clause. He therefore recommended that the district court dismiss the claims against Modiin and Dagoni, but order additional discovery to determine whether Friedman's contacts with Massachusetts were sufficient to permit the exercise of personal jurisdiction.

By memorandum and order dated May 29, 1990, Chief Judge Frank H. Freedman adopted the Report and Recommendation. Noting plaintiffs' assent to VV's motion to transfer, Chief Judge Freedman on February 20, 1991, transferred the case to the Southern District of New York.

In the Southern District of New York, by order dated September 3, 1991, Judge John F. Keenan dismissed the claim against Friedman as untimely under New York's one-year statute of limitations applicable to defamation claims. Judge Keenan applied the New York statute, rather than the Massachusetts statute under which the claim was timely, "to prevent plaintiffs from filing an action in a forum where the statute of limitations is favorable but where personal jurisdiction cannot be exercised, then transferring the

action to the forum where personal jurisdiction can be exercised and attempting to carry with the action the more favorable statute of limitations."

On September 21, 1992, after her husband's death, Marilyn Chaiken amended the complaint to assert additional claims.

The action was then assigned to Judge Shira A. Scheindlin. After extended discovery, Judge Scheindlin granted VV's motion for summary judgment in October 1995. Finding that Friedman's article "undeniably relates to a matter of public concern," 907 F.Supp. 689, 696 (S.D.N.Y.1995), she ruled that plaintiffs could not recover without showing that VV had acted in a "grossly irresponsible" manner in publishing it, and that plaintiffs had failed to make such a showing. *Id.* at 697–98. Judge Scheindlin also ruled that even if Friedman knowingly fabricated the article, VV could not be vicariously liable because Friedman was an independent contractor rather than an employee. *Id.* at 698–99. Finally, the judge ruled that a showing of gross irresponsibility was essential to recovery for the tort of intentional infliction of emotional distress and dismissed that claim as well for failure to make the necessary showing. *Id.* at 699.

### Discussion

On appeal, the Chaikens argue that (1) the Massachusetts district court erred in dismissing their claims against Modiin and Dagoni for lack of personal jurisdiction; (2) Judge Keenan erred in dismissing their claims against Friedman under the New York statute of limitations; and (3) Judge Scheindlin erred in ruling that (a) the article involved a matter of public concern; (b) there was no evidence of gross irresponsibility on the part of VV; (c) Friedman was an independent contractor; (d) principals are not liable under New York law for the defamatory statements of their independent contractors; and (e) plaintiffs may not recover for intentional infliction of emotional harm and outrageous conduct without meeting the

standards applicable to actions for defamation. We reject each of these contentions.

### A. Dismissal of the Claims in Massachusetts against Modiin and Dagoni

■■■■ This Court reviews *de novo* a dismissal for lack of personal jurisdiction.[2] *Metropolitan Life Ins. Co. v. Robertson–Ceco Corp.*, 84 F.3d 560, 567 (2d Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 508, 136 L.Ed.2d 398 (1996). On a motion under Rule 12(b)(2) to dismiss for lack of personal jurisdiction, the plaintiff has the burden of showing that the court has jurisdiction. *Id.* at 566. Before discovery, a plaintiff may defeat such a motion with legally sufficient allegations of jurisdiction. *Id.* Where the parties have conducted jurisdictional discovery but have not held an evidentiary hearing, the plaintiff must allege facts that, "if credited ..., would suffice to establish jurisdiction over the defendant." *Id.* at 567 (internal quotation marks omitted).

The exercise of personal jurisdiction is proper if the defendants have contacts sufficient to satisfy both the Massachusetts long-arm statute and the due process clause of the Fourteenth Amendment. *Id.* The district court adopted the reasoning of the magistrate judge, who found that the long-arm statute "appear[s]" to authorize the court to exercise jurisdiction over both Modiin and Dagoni, but ruled that the due process clause prevented it from doing so.

*1. The Massachusetts Long–Arm Statute.* The Massachusetts long-arm statute, derived from the Uniform Interstate and International Procedure Act, provides, in relevant part, that a court may exercise personal jurisdiction over a person as to a cause of action arising from the person's

(a) transacting any business in this commonwealth;

(b) contracting to supply services or things in this commonwealth;

(c) causing tortious injury by an act or omission in this commonwealth;

**2.** We have jurisdiction to review the interlocutory judgment of the United States District Court for the District of Massachusetts entered prior to the transfer of the case to a district court within

our jurisdiction and the issuance by that court of a final order. *See Mackensworth v. S.S. Am. Merchant,* 28 F.3d 246, 250 (2d Cir.1994).

(d) causing tortious injury in this commonwealth by an act or omission outside this commonwealth if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this commonwealth;

(e) having an interest in, using or possessing real property in this commonwealth.

Mass. Ann. Laws ch. 223A, § 3 (Law.Co-op.Supp.1997).

■ The district court accepted the magistrate judge's finding that § 3(c) of the Massachusetts long-arm statute authorizes jurisdiction over all defendants. This conclusion appears plausible with respect to Modiin, which performed the affirmative act of distributing its newspapers in Massachusetts. Because the Chaikens' claims against Modiin arise out of this "act ... in th[e] commonwealth," § 3(c) appears to authorize the exercise of jurisdiction over Modiin. Although the district court did not consider § 3(a), which the Massachusetts courts have "construed broadly," *Tatro v. Manor Care, Inc.,* 416 Mass. 763, 767, 625 N.E.2d 549, 551 (1994), it seems likely that Modiin's distribution of newspapers in Massachusetts would also constitute "transacting ... business" under this section and thus justify the exercise of jurisdiction. But because we agree with the Massachusetts district court's ruling on the due process clause, *see infra* Section A.2, we do not rule whether these provisions authorize the exercise of jurisdiction over Modiin.

■ We doubt that the long-arm statute allows Massachusetts courts to exercise jurisdiction over Dagoni, who committed no act "in" Massachusetts and had no other appreciable contacts with the state. In finding that Dagoni's conduct "appeared" to permit the court to exercise jurisdiction under § 3(c), the magistrate judge acknowledged that he had not located "any Massachusetts case law asserting personal jurisdiction under § 3(c) against a non-resident defendant for defamation." Indeed, the magistrate judge relied primarily on *Murphy v. Erwin–Wasey, Inc.,* 460 F.2d 661, 664 (1st Cir.1972) and *Ealing Corp. v. Harrods Ltd.,* 790 F.2d 978, 982 (1st Cir.1986), which held that non-resident defendants had committed acts "in" Massachusetts by intentionally sending fraudulent misrepresentations into the state with the purpose of causing harm there. The magistrate judge also relied on *Buckley v. New York Post Corp.,* 373 F.2d 175, 178–80 (2d Cir.1967), in which Judge Friendly interpreted an "analogous" Connecticut provision to confer jurisdiction over a New York publisher that had distributed defamatory materials in Connecticut.

Dagoni's conduct is distinguishable from that of the defendants in *Murphy, Ealing,* and *Buckley,* each of whom affirmatively distributed information in the state that sought to exercise jurisdiction. Indeed, Judge Friendly noted that "it would seem hard to deny that distributing two thousand copies of a libel about a resident in Connecticut is 'tortious conduct in this state.'" *Buckley,* 373 F.2d at 178 (quoting the statute). Similarly, the courts in *Murphy* and *Ealing* emphasized that the defendants had sent fraudulent misrepresentations directly into Massachusetts over the telephone and by mail, with intent to cause harm there.

In contrast, Dagoni sent his article to Israel with the expectation that it would appear there. Even accepting the Chaikens' assertion that he knew that his article would have effects in Massachusetts, we cannot conclude that Dagoni committed an act "in" Massachusetts. To construe his conduct as taking place "in" that state would "render § 3(d) [conferring jurisdiction over a defendant who causes tortious injury in the state by an act outside the state, if certain conditions are met] a nullity." *Murphy,* 460 F.2d at 664.

Moreover, the Court of Appeals for the First Circuit has recently expressed "profound reservations" about applying the *Murphy* rationale, which was conceived in an action for fraudulent representation, to defamation claims. *Ticketmaster–New York, Inc. v. Alioto,* 26 F.3d 201, 205 (1st Cir.1994). In *Ticketmaster,* a *Boston Globe* reporter called an attorney in California who, knowing that his statements might be published in Boston, made allegedly defamatory remarks about the plaintiff. In considering whether the

attorney's conduct fell within the ambit of § 3(a), the court noted that "logic suggests that, on these facts, the defendant cannot be said to have performed 'an act' in Massachusetts." *Id.* Commenting that "it would seem hard to characterize the act of publishing an allegedly defamatory remark outside the forum state as an act within the forum state," the court also observed that "five courts applying long-arm statutes patterned after the Uniform Act have eschewed *Murphy*'s reasoning in the defamation context and declined to assert jurisdiction on this basis." *Id.* at 205 n. 5.

Despite its reservations about applying the *Murphy* rule to defamation, the *Ticketmaster* court conceded that *Murphy*'s "interpretation of section 3(c) is worded in general terms and its reasoning conceivably could be transferred to the defamation context." *Id.* at 205. To avoid this unsettled question of Massachusetts law, the *Ticketmaster* court chose to "bypass the statutory phase of the jurisdictional inquiry" and ruled that the assertion of jurisdiction could not "pass constitutional muster." *Id.* at 206.

As Dagoni performed no "act" as closely connected to Massachusetts as a telephone call with that state, and given the First Circuit's apparent reluctance to extend the rationale of *Murphy,* we cannot interpret § 3(c) to provide a proper basis for jurisdiction over Dagoni. By its terms, § 3(c) requires not only "tortious injury" in Massachusetts, but also an act there. As already discussed, Dagoni researched and wrote his article in New York and New Jersey, then dispatched it to Israel. Even if the article caused tortious injury in Massachusetts and he knew that it might do so, Dagoni simply did not commit "an act or omission in th[e] commonwealth." We therefore conclude that § 3(c) does not authorize the exercise of jurisdiction over Dagoni. *See McFarlane v. Esquire Magazine,* 74 F.3d 1296, 1300 (D.C.Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 53, 136 L.Ed.2d 16 (1996) (finding that an almost identical provision in the District of Columbia long-arm statute, also derived from the Uniform Act, does not authorize jurisdiction over a non-resident author whose article appeared in a magazine distributed in the District).

The Chaikens did not allege jurisdiction under § 3(d), but later claimed that they had implicitly invoked it. Even if they had asserted this provision, it would not support jurisdiction on these facts. Whether or not Dagoni caused tortious injury in Massachusetts, the record contains no suggestion that he *"regularly* does or solicits business," "engages in any other *persistent* course of conduct," or "derives *substantial* revenue from goods used or consumed or services rendered" in Massachusetts. Mass. Ann. Laws ch. 223A § 3(d) (Law.Co-op.Supp.1997) (emphasis added). For this reason, § 3(d) cannot provide a basis for jurisdiction over him.

We find that § 3 of the Massachusetts long-arm statute does not authorize the Massachusetts courts to exercise jurisdiction over Dagoni. As to Modiin, the question is closer but we need not decide it because we find that due process forbids Massachusetts from exercising jurisdiction over it.

*2. The Due Process Clause.* The due process clause of the Fourteenth Amendment permits a state to exercise personal jurisdiction over a non-resident defendant with whom it has "certain minimum contacts ... such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Calder v. Jones,* 465 U.S. 783, 788, 104 S.Ct. 1482, 1486, 79 L.Ed.2d 804 (1984) (quoting *Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 342, 85 L.Ed. 278 (1940) and *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945)). In determining whether minimum contacts exist, the court considers "the relationship among the defendant, the forum, and the litigation." *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 775, 104 S.Ct. 1473, 1478, 79 L.Ed.2d 790 (1984) (quoting *Shaffer v. Heitner,* 433 U.S. 186, 204, 97 S.Ct. 2569, 2579, 53 L.Ed.2d 683 (1977)).

The Chaikens argue that Modiin's contacts with Massachusetts were sufficiently "continuous and systematic" to permit that state to exercise "general jurisdiction," that is, to require Modiin to defend a lawsuit unrelated to

its contacts with the forum. *See Metropolitan Life*, 84 F.3d at 568. They maintain that the regular weekly circulation of 183 copies in Massachusetts, producing annual gross revenues of $21,000, satisfies the "more stringent minimum contacts test" for general jurisdiction. *Id.*

In *Metropolitan Life*, we noted that, "standing alone," defendant's $4 million in sales in the forum state over a seven-year period "may not have been sufficient" to support the exercise of general jurisdiction. *Id.* at 573. The numerous other contacts present in that case—including advertising, relationships with dealers, and over 150 visits to the forum—"tip[ped] the balance" and led us to conclude that there were sufficient contacts to allow the exercise of general jurisdiction. *Id.* Given Modiin's far more limited contacts with Massachusetts, we find that the exercise of general jurisdiction by that state would not comport with the requirements of due process.

To establish the minimum contacts necessary to justify "specific" jurisdiction, the Chaikens first must show that their claim arises out of or relates to Modiin's contacts with Massachusetts. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414, 104 S.Ct. 1868, 1872, 80 L.Ed.2d 404 (1984). The Chaikens must also show that Modiin "purposefully availed" itself of the privilege of doing business in Massachusetts and that it could foresee being "haled into court" there. *See World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980); *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528 (1985).

■ If the Chaikens satisfy these requirements, the court also considers whether the assertion of jurisdiction "comports with 'traditional notions of fair play and substantial justice'—that is, whether it is reasonable under the circumstances of a particular case." *Metropolitan Life*, 84 F.3d at 568 (quoting *International Shoe*, 326 U.S. at 316, 66 S.Ct. at 158); *see also Ticketmaster*, 26 F.3d at 206. Whether it is "reasonable" to exercise jurisdiction in a particular case depends on "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies." *Metropolitan Life*, 84 F.3d at 568 (citing *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 113–14, 107 S.Ct. 1026, 1032–33, 94 L.Ed.2d 92 (1987), and *Burger King*, 471 U.S. at 475, 105 S.Ct. at 2184); *see also Ticketmaster*, 26 F.3d at 209.

On two occasions, the United States Supreme Court has specifically considered when states may constitutionally exercise jurisdiction over non-residents in defamation actions. In *Keeton*, the Court found that a magazine publisher's "regular" monthly circulation of 10,000 to 15,000 copies in New Hampshire was "sufficient to support an assertion of jurisdiction in a libel action based on the contents of the magazine." 465 U.S. at 773–74, 104 S.Ct. at 1478. The Court ruled that "monthly sales of thousands of magazines" could not be characterized as "random, isolated, or fortuitous" and therefore provided sufficient "minimum contacts" between the defendant and the state. *Id.* at 774, 104 S.Ct. at 1478. After examining, among other things, the state's "interest" in asserting jurisdiction, the interest of the non-resident plaintiff, and the burden on the defendant, the Court found *no* unfairness in requiring the producer of a "national publication aimed at a nationwide audience" to defend libel actions "wherever a *substantial* number of copies are regularly sold and distributed." *Id.* at 781, 104 U.S. at 1482 (emphasis added).

In *Calder*, the Court held that the due process clause did not prevent California from exercising personal jurisdiction over the writer and editor of an article that allegedly defamed a California resident. The Court emphasized that the story appeared in a weekly newspaper with a California circulation of 600,000 copies, was drawn from California sources, and concerned the California activities of a California resident whose career was "centered in" that state. *Calder*, 465 U.S. at 788–89, 104 S.Ct. at 1486. On

these facts, the Court found that California was the "focal point both of the story and of the harm suffered," that defendants knew that the "brunt" of plaintiff's injury would be felt here, and that the defendants' "actions were expressly aimed at California." *Id.* at 789–90, 104 S.Ct. at 1486–87. For these reasons, the Court ruled that although defendants were Florida residents and had not acted in California, they had directed their activities at that state and could therefore have reasonably anticipated "being haled into court there." *Id.*

The district court found Modiin's contacts with Massachusetts so insubstantial that the exercise of jurisdiction would violate the due process clause. In recommending that the claims against Modiin be dismissed, the magistrate judge emphasized that only four copies—.004% of its total circulation—of the newspaper containing Dagoni's article arrived in Massachusetts. Given *Maariv*'s "tiny circulation" in Massachusetts and the absence of other significant contacts, the magistrate judge believed that exercising jurisdiction over Modiin would violate the due process clause. The district court accepted this reasoning, noting that even the Massachusetts distribution of the *Maariv* Sunday edition (183 copies) would not create sufficient contacts to satisfy the due process clause.

We agree with the district court that Modiin's contacts with Massachusetts were minimal. Even if we consider the *Maariv* Sunday edition, which did not contain Dagoni's article, *Maariv*'s Massachusetts sales are a tiny fraction of its total circulation and are insignificant compared to the 10,000 to 15,000 copies of a monthly publication found to justify jurisdiction in *Keeton.* We doubt that four copies per day, or even the 183 copies of the Sunday edition, constitute the "substantial number of copies" that makes it fair to exercise jurisdiction over a non-resident publisher. *Keeton,* 465 U.S. at 781, 104 S.Ct. at 1482.

Moreover, unlike the defendants in *Calder,* Modiin did not "expressly aim[ ]" its actions at Massachusetts. As already discussed, Modiin sent only four copies of the *Maariv* daily edition to that state, and had no reason to think that the "brunt of the harm" would be felt there. Although Modiin knew that the Chaikens had come to the West Bank from Massachusetts, it appeared that they had settled permanently in Israel. Indeed, the article described only the Chaikens' activities in Israel. For this reason, Modiin had reason to believe that any possible effects of the article, "in terms both of . . . emotional distress and . . . injury to . . . reputation," would be felt in Israel rather than Massachusetts. *See Calder,* 465 U.S. at 789, 104 S.Ct. at 1486.

■ Under these circumstances, we find that Modiin did not have sufficient minimum contacts with Massachusetts to justify the exercise of jurisdiction by that state. Even assuming that the Chaikens had demonstrated that Modiin had the necessary minimum contacts with Massachusetts, we believe that the exercise of personal jurisdiction in this case would not comport "with our traditional conception of fair play and substantial justice." *International Shoe,* 326 U.S. at 320, 66 S.Ct. at 160. Upon consideration of the five-factor "fairness" test set forth in *Asahi* and *Burger King,* we find that the exercise of jurisdiction by Massachusetts would be unreasonable.

First, adjudication in Massachusetts would impose a significant burden on an Israeli newspaper with no meaningful presence in the state. Second, Massachusetts has little interest in adjudicating the case. Although the Chaikens allegedly maintain a home in Springfield, they live full time in Israel, which may lessen Massachusetts' interest in protecting their reputation. Third, because the Chaikens live in Israel, adjudication in Massachusetts does not appear to advance their "interest in obtaining convenient and effective relief." *Burger King,* 471 U.S. at 477, 105 S.Ct. at 2184 (internal quotation marks omitted). Fourth, because the parties, witnesses, and evidence are all located in Israel, proceedings in Massachusetts will not advance the "interest in obtaining the most efficient resolution of controversies." *Id.* Finally, the Chaikens have suggested no "fundamental substantive social policies," *id.,* that favor the exercise of jurisdiction by Massachusetts. For these reasons, and giv-

en the weakness of Modiin's contacts with Massachusetts, we find that it would be unreasonable for that state to exercise jurisdiction in this action. *See Metropolitan Life*, 84 F.3d at 568–569 (noting that the weakness of plaintiff's showing of minimum contacts places greater emphasis on the reasonableness of exercising jurisdiction).

The Chaikens argue that *Gordy v. Daily News, L.P.*, 95 F.3d 829 (9th Cir.1996), requires a different result. In *Gordy,* the Ninth Circuit held that due process did not prevent California from exercising jurisdiction over the *Daily News* and its reporter in a libel case, although only 13 copies of its daily edition and 18 copies of its Sunday edition circulated in that state. Whether or not the legal principles set forth in *Gordy* are correct, the facts of that case were quite different from those presented here.

The court found in *Gordy* that the *Daily News* frequently covered events in California, regularly sent reporters and used stringers and news services there, and made telephone calls to California to research the offending article. *Id.* at 831. Moreover, the author and the *Daily News* knew that Gordy lived in California and that the effects of the article would be felt there. *Id.* at 835–36. The court also found that it was reasonable for California to exercise jurisdiction over a defendant who does regular business there in order to protect the reputation of an individual presently domiciled there. *Id.* Given these factual differences, California's exercise of jurisdiction in *Gordy* is not inconsistent with the district court's ruling that Massachusetts may not exercise jurisdiction here. We therefore affirm the ruling that Massachusetts could not constitutionally exercise jurisdiction over Modiin on the Chaikens' claims.

*B. Dismissal of the Claims against Friedman*

■ When Judge Keenan dismissed the claims against Friedman as untimely under the New York statute of limitations, he did not state explicitly that he was applying New York law because the Massachusetts court lacked personal jurisdiction over Friedman. The Chaikens argue that Judge Keenan applied the New York statute of limitations because he erroneously believed that, following a transfer under 28 U.S.C. § 1404(a), the transferee court must apply the statute of limitations of the state in which it sits.

■ We do not think that Judge Keenan's ruling was based on such a view. In applying the New York limitations period, Judge Keenan specifically cited *Levy v. Pyramid Co.*, 871 F.2d 9, 10 (2d Cir.1989) (per curiam), which held that if a plaintiff moves to transfer an action based on diversity of citizenship "from one federal trial court to another so as to cure a defect of personal jurisdiction over the defendant, the state law of the transferee forum governs the action for the purposes of the statute of limitations." Judge Keenan explained that this rule seeks to prevent plaintiffs from bringing suit in courts that have favorable statutes of limitations but lack personal jurisdiction, "then transferring the action to the forum where personal jurisdiction can be exercised and attempting to carry with the action the more favorable statute of limitations."

In light of his invocation of *Levy* and explanation of its rule, we think it clear that Judge Keenan applied the New York statute of limitations not because he believed the transferee forum's statute of limitations applies automatically following a transfer, but because he implicitly found that the Massachusetts district court lacked personal jurisdiction over Friedman.

The Chaikens say that the *Levy* rule is inapplicable to their claims because the defendants initiated the transfer. The Chaikens expressly consented to transfer "in order to facilitate the denial of ... Freedman's [sic] motion to dismiss for lack of jurisdiction." Even if they did not initiate the transfer, the Chaikens agreed to it at least in part to cure a possible defect in personal jurisdiction. Although *Levy* involved a transfer initiated by a plaintiff, we believe that its rationale applies with equal force to these circumstances. Accordingly, we agree with Judge Keenan that if the Massachusetts district court lacked jurisdiction over Friedman, the New York statute of limitations applies to the Chaikens' claims against him. We

therefore consider whether the Massachusetts court had personal jurisdiction over Friedman.

■ Applying the principles set forth in our discussion of the claims against Dagoni, *see supra* Section A.1., we conclude that the Massachusetts long-arm statute does not authorize its courts to exercise jurisdiction over Friedman. The record reveals that Friedman, like Dagoni, performed no act "in" Massachusetts. He researched and wrote his article in Israel and New York, used no sources in Massachusetts, delivered the article in New York, and played no role in its Massachusetts distribution. Accordingly, § 3(c) provides no basis for jurisdiction. There is also no suggestion in the record that Friedman "regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered" in Massachusetts. *See* Mass. Ann. Laws ch. 223A, § 3(d) (Law.Co-op. Supp.1997). For this reason, even if Friedman caused the Chaikens "tortious injury" by an act outside Massachusetts, § 3(d) would not confer jurisdiction over him in Massachusetts.

We therefore conclude that Judge Keenan correctly applied the New York statute of limitations and dismissed the Chaikens' claims against Friedman as untimely.

## C. Summary Judgment in Favor of VV

Judge Scheindlin granted summary judgment dismissing the Chaikens' defamation claims against VV because she found that (1) even if Friedman's article contained libelous material, VV had not published it with the requisite level of fault; and (2) because Friedman worked as an independent contractor rather than an employee, VV could not be liable even if he knowingly fabricated or distorted the remarks attributed to the Chaikens. Judge Scheindlin dismissed the claims for intentional infliction of emotional distress because the Chaikens had not shown the level of fault necessary to sustain a defamation claim and therefore should not be allowed to "circumvent the established and carefully balanced framework of constitutional and state libel law." 907 F.Supp. at 699.

The Chaikens argue that (1) Judge Scheindlin erred in finding that Friedman's article involved matters of "public concern" and thus requiring a higher level of fault; (2) there was evidence that VV acted with "gross irresponsibility" in publishing Friedman's article; (3) there was evidence that Friedman was an employee of VV; (4) VV was in any event liable under agency principles for Friedman's intentional defamation; and (5) Judge Scheindlin should not have required a showing of gross irresponsibility for their intentional infliction of emotional distress claims.

### 1. Direct Liability for Defamation

The United States Supreme Court held in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 347–49, 94 S.Ct. 2997, 3010–11, 41 L.Ed.2d 789 (1974), that the First Amendment prohibits states from imposing liability for defamatory statements about matters of public concern under a theory of strict liability. In keeping with its "tradition" of "providing the broadest possible protection to the sensitive role of gathering and disseminating news of public events," *Immuno A.G. v. Moor–Jankowski*, 77 N.Y.2d 235, 249, 566 N.Y.S.2d 906, 913, 567 N.E.2d 1270 (internal quotation marks omitted), *cert. denied*, 500 U.S. 954, 111 S.Ct. 2261, 114 L.Ed.2d 713 (1991), the New York Court of Appeals has adopted a rule even more protective of the press than the one announced in *Gertz*.

■ Under this "gross irresponsibility" standard, if an article is "arguably within the sphere of legitimate public concern" or "reasonably related to matters warranting public exposition," the party allegedly defamed can recover only by establishing, by a preponderance of the evidence, that "the publisher acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties." *Chapadeau v. Utica Observer–Dispatch, Inc.*, 38 N.Y.2d 196, 199, 379 N.Y.S.2d 61, 64, 341 N.E.2d 569 (1975).

Thus, if Friedman's article was "arguably within the sphere of legitimate public concern," the Chaikens could defeat VV's motion

**1032**

for summary judgment only if there were triable issues of fact as to whether VV acted in a grossly irresponsible manner.

■ *a. Public concern.* New York courts generally defer to publishers' judgments as to what subjects are matters of public concern: "[w]hile not conclusive, a commercial enterprise's allocation of its resources to specific matters and its editorial determination of what is newsworthy, may be powerful evidence of the hold those subjects have on the public's attention." *Gaeta v. New York News, Inc.,* 62 N.Y.2d 340, 349, 477 N.Y.S.2d 82, 85, 465 N.E.2d 802 (1984) (internal quotations omitted); *see also Weiner v. Doubleday & Co.,* 74 N.Y.2d 586, 595, 550 N.Y.S.2d 251, 255, 549 N.E.2d 453 (1989), *cert. denied,* 495 U.S. 930, 110 S.Ct. 2168, 109 L.Ed.2d 498 (1990).

■ We agree with Judge Scheindlin that Friedman's article "undeniably relates to a matter of public concern." 907 F.Supp. at 696. The article discussed Jewish terrorism on the West Bank, focussing on the role of emigres from United States and on financial support from the United States. By describing the attitudes and behavior of Jewish settlers in and around Hebron, it provided background information about the circumstances giving rise to tension and conflict in that area. We can hardly doubt that there exists substantial public concern about such topics. For this reason, Judge Scheindlein was correct to require the Chaikens to prove that VV acted with gross irresponsibility in publishing Friedman's article.

■ *b. The Level of VV's Fault (If Any).* In determining whether the Chaikens raised a triable issue of fact as to whether VV acted in a grossly irresponsible manner, we consider whether it (1) followed "sound journalistic practices" in preparing the allegedly defamatory article; (2) followed "normal procedures," including editorial review of the copy; (3) had any reason to doubt the accuracy of the source relied upon and thus a duty to make further inquiry to verify the information; and (4) could easily verify the truth. *Dalbec v. Gentleman's Companion, Inc.,* 828 F.2d 921, 924–25 (2d Cir.1987) (quoting *Hawks v. Record Printing & Pub.*

*Co.,* 109 A.D.2d 972, 486 N.Y.S.2d 463, 466 (3d Dep't 1985)). A publisher will not be liable for an article later shown to be false if it relies upon the integrity of a reputable author and has no serious reason to question the accuracy of the information provided by that author. *Weiner,* 74 N.Y.2d at 595, 550 N.Y.S.2d at 255, 549 N.E.2d 453. Absent "obvious reasons" to doubt the truth of an article, a newspaper does not have the "intolerable burden of rechecking every reporter's assertions and retracing every source before" publication. *Karaduman v. Newsday,* 51 N.Y.2d 531, 549, 435 N.Y.S.2d 556, 565, 416 N.E.2d 557 (1980).

■ The record supports Judge Scheindlin's finding that VV did not act with "gross irresponsibility." When VV published his article, Friedman was an "established" writer with a sound reputation. He had written eight articles in the *Voice* with no complaints, and had also written six articles for major newspapers, including the *New York Times* and the *Los Angeles Times.* Neither the contents of the article nor any external circumstance suggested that the article contained any falsity. As a result, VV had no duty to take the extraordinary step of checking every source and verifying every quotation, which would have been particularly onerous in this case, as many of the subjects lived in Israel. It is also clear that VV subjected the article to its normal editorial process, including verification of facts. On this record, no reasonable jury could find that VV acted in a grossly irresponsible manner.

The letters submitted by the Chaikens' three "experts" do not require a different conclusion. These experts—David Bar–Illan, an executive editor at the *Jerusalem Post,* Joshua Muravchik, a "resident scholar" at the American Enterprise Institute for Public Policy Research, and one Neil C. Livingstone, Ph.D.—opine that VV was grossly irresponsible in implying that the Chaikens were terrorists and in failing to verify the quotations attributed to them. Bar–Illan also states that the fact that Friedman did not tape-record his interviews with the Chaikens should have alerted VV to possible improprieties. In light of the clear case law

holding that, in the circumstances presented here, a publisher has no duty to undertake the extraordinary measures suggested by the Chaikens, the opinions of these experts do not raise an issue of material fact. Moreover, their unsworn letters do not satisfy the requirements of Fed.R.Civ.P. 56(e) and therefore cannot defeat VV's motion for summary judgment.

The Chaikens also argue that VV had three "obvious reasons" to doubt the truth of the article and should therefore have engaged in a more searching inquiry. First, they say that VV should have been on warning because it was "inherently implausible" that they would make the anti-Arab statements attributed to them. Judge Scheindlin correctly rejected this contention. The article described ultra-orthodox settlers who lived in the midst of a hostile group and espoused extreme ideology. In context, there was nothing "inherently implausible" about the words or deeds Friedman attributed to the Chaikens. We therefore agree with Judge Scheindlin that the contents of the article did not by themselves put VV on notice of potential factual errors.

█ Second, the Chaikens argue that Friedman was biased against Israel, Jews, and against them in particular. They say that this bias is evident in Friedman's writings and should have caused VV to verify his work more carefully. In support of this theory, they have submitted an article claiming that Friedman has repeatedly taken positions critical of right-wing Israeli groups. But this article finds evidence of Friedman's alleged bias largely in articles he wrote after 1985. It therefore does not support the notion that VV could or should have known *in 1985* that Friedman had such a bias. The record also shows that Friedman never met the Chaikens before his interview, so VV had no basis to suspect that he harbored personal animosity against them individually. We therefore reject the Chaikens' argument that external facts should have alerted VV to possible falsity in the article and thereby triggered a higher standard of care.

█ Third, the Chaikens claim that because the article implies that they are terrorists, VV should have checked it more carefully. They contend that it was grossly irresponsible for VV to publish such "defamatory innuendo" without carefully checking all the sources. This argument places the cart before the horse by making the publication of any potentially damaging remark an indication of irresponsibility. This approach would require a publisher to undertake additional research to verify the truthfulness of any statement that might damage a reputation. We decline to adopt such an approach, which would defeat the very purpose of the rule permitting the imposition of liability only upon a showing of gross irresponsibility.

### 2. *Vicarious Liability for Friedman's Alleged Defamation*

The Chaikens maintain that even if VV did not act with sufficient culpability to permit the imposition of direct liability, it is nevertheless liable under the doctrine of *respondeat superior* for the intentional defamation committed by Friedman, who was its employee when it published his article. The district court rejected this argument, concluding that in 1985 Friedman was an independent contractor, not an employee, of VV. The Chaikens challenge this ruling, and also argue that even if Friedman was an independent contractor, VV is vicariously liable for his defamation.

*a. Friedman's Employment Status.* Under New York law, the distinction between an employee and an independent contractor has been said to rest in the fact that the former "undertakes to achieve an agreed result and to accept the directions of his employer as to the manner in which the result shall be accomplished," while the latter "agrees to achieve a certain result but is not subject to the orders of the employer as to the means which are to be used." *In re Morton,* 284 N.Y. 167, 172, 30 N.E.2d 369, 371 (1940). Under this view, the crucial determinant is the "existence of the right of control over the agent in respect of the manner in which his work is to be done." *Id.* (internal quotation marks omitted).

█ In a case arising under the National Labor Relations Act, we elaborated on this "common law 'right to control' test for distin-

guishing between employees and independent contractors." *Hilton Int'l Co. v. NLRB,* 690 F.2d 318, 320 (2d Cir.1982). We noted that an employee-employer relationship exists only if "the purported employer controls or has the right to control both the result to be accomplished, and the manner and means by which the purported employee brings about that result." *Id.* (citations and internal quotations omitted). In determining whether such control exists, we consider such factors as (1) whether the purported employee is engaged in a distinct occupation; (2) whether the work is usually done under direction or by an unsupervised specialist; (3) the skill involved; (4) who provides the instrumentalities and place of performance; (5) the length of employment; (6) whether payment is by the time or by the job; (7) whether the work is part of the employer's regular business and/or necessary to it; and (8) the intent of the parties creating the relationship. *Id.* at 320–21 (citing Restatement (Second) of Agency § 220(2)).

■ Upon consideration of these factors, it is clear that in 1985 Friedman was an independent contractor. Friedman was an experienced reporter who selected topics and conducted research independently, and wrote articles without any guidance from VV. Research for the article discussing the Chaikens was funded by an outside organization. In addition, *Voice* editors reviewed the article only after Friedman completed a draft, and made few substantive changes.

■ The terms and conditions of Friedman's employment also illustrate his independent status. With no regular salary or contract, he was paid only for articles the *Voice* decided to publish, did not receive fringe benefits or an office at the *Voice,* did not have taxes withheld, and was not listed on the *Voice* masthead as a staff writer. He continued to write for other sources. When Friedman became a staff writer for the *Voice* in 1989, he began to receive the full panoply of benefits. This contractual change in his status reinforces the conclusion that in 1985

neither Friedman nor VV regarded him as an "employee." [3]

We therefore affirm Judge Scheindlin's ruling that the Chaikens may not recover from VV on a theory of respondeat superior.

■ *b. Recovery Under Agency Principles.* The Chaikens argue that they may recover from VV under general agency principles if Friedman, acting as an independent contractor, intentionally or recklessly defamed them. We consider this claim briefly, although the district court did not address it explicitly and the record does not make clear that the Chaikens even raised it below.

To hold that a publisher can be liable for the defamatory statements of an independent contractor without a showing of gross irresponsibility would defeat the purpose of requiring that showing. A publisher that takes appropriate measures to ensure the truthfulness of articles it publishes, but fails to detect the knowing falsity of a previously reliable freelance journalist should not be held vicariously liable for that falsity. To do so would impose on publishers all of the burdens that the "gross irresponsibility standard" seeks to lift. We therefore reject the Chaikens' attempt to impose vicarious liability on VV.

### 3. Other Matters

■ The district court dismissed the Chaikens' claims of intentional infliction of emotional distress because it found that they were asserting these claims in order to "circumvent" the limitations placed on defamation claims. The Chaikens dispute this decision, and also argue that the district court failed to rule on their implicit claims based on outrageous conduct and negligent publication of facts that exposed them to danger.

We agree with the district court that the Chaikens cannot avoid the obstacles involved in a defamation claim by simply relabeling it as a claim for intentional infliction of emotional distress. *See Hustler Magazine, Inc. v. Falwell,* 485 U.S. 46, 56, 108 S.Ct. 876, 882, 99 L.Ed.2d 41 (1988) (holding that a public

---

**3.** We recognize that in 1985 VV had purchased libel insurance for Friedman. While that fact gives some support to the argument that he was

an employee, it *is* insufficient to raise a jury question.

figure cannot recover for intentional infliction of emotional harm resulting from a false publication without proving actual malice). Thus, to sustain an action under New York law for the intentional infliction of emotional distress by publication of a defamatory statement, the Chaikens had to show that the *Voice* acted with gross irresponsibility in publishing Friedman's article. Having already found that they did not make this showing, we affirm the district court's dismissal of these claims.

On appeal, the Chaikens attempt to recharacterize their outrageous conduct claim as one sounding not in intentional infliction of emotional distress, but in negligent infliction of unreasonable danger. They argue that the *Voice*'s publication of Friedman's article made them targets for the "hostile Arabs" among whom they lived and "expose[ed] them to unreasonable risks of criminal aggression." This claim appears to rest not on the alleged falsity of the article, but rather on the fact that even if it was true, its publication negligently exposed the Chaikens to danger.

Because the Chaikens never raised this claim below, we will not consider its merits now. Although they amended their complaint on three occasions, once to include the assertion that the Voice's "libelous article" was a "contributing factor to John Chaiken's being stabbed" and to claim "special damages" for this stabbing, the Chaikens never suggested that they sought to hold VV liable for the negligent publication of *true* statements that exposed them to unreasonable danger. We will not entertain this claim for the first time on appeal.

### Conclusion

We affirm the decisions of the district judges in their entirety.