### In re SUMITOMO COPPER LITIGATION.

### No. 96CIV. 4584(MP).

United States District Court,
S.D. New York.

Oct. 30, 2000.

Lovell & Stewart, LLP, New York, Lead Counsel, Miller Faucher Cafferty and Wexler, Chicago, IL, Lowey Dannenberg Bemporad & Selinger, P.C., The Gateway, White Plains, NY, for Plaintiffs.

Salans Hertzfeld Heilbronn Christy & Viener, New York, NY, for Defendants Ashley M. Levett and Charles A.M. Vincent.

## OPINION

MILTON POLLACK, Senior District Judge.

Defendants Ashley M. Levett ("Levett") and Charles A.M. Vincent ("Vincent") each move, pursuant to Rules 12(b)(2) and 12(b)(6) of the Federal Rules of Civil Procedure, for an order dismissing Plaintiffs' Sixth Amended Consolidated Class Action Complaint and Supplemental Sixth Amended Complaint (collectively, the "Complaints") against them for lack of personal jurisdiction, for having been filed in violation of Rules 15 and 21 of the Federal Rules of Civil Procedure, and as barred by the statute of limitations. For the reasons stated herein, this Court denies Levett and Vincent's motion to dismiss on all grounds.

### I. BACKGROUND

In the Complaints, Plaintiffs assert claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq., and the common law of New York alleging that the prices of copper futures contracts traded on the Commodity Exchange Inc. and the Comex division of the New York Merchantile Exchange Inc. were artificially inflated between June 24, 1993 and June 15, 1996, inclusive, by an alleged conspiracy of certain defendants.

### A. PROCEDURAL HISTORY

On June 28, 1996, Plaintiff Zuccarelli filed a complaint against several defendants, including Levett and Vincent. *Zuccarelli v. Sumitomo Corp.*, 96 Civ. 4940. After that case was consolidated into *In re Sumitomo Copper Litig.*, 96 Civ. 4584, Plaintiffs filed a Consolidated Amended Class Action Complaint which also named Levett and Vincent as defendants. On September 30, 1997, Plaintiffs voluntarily dismissed, without prejudice, their claims against Levett and Vincent. On December 10, 1998, this Court entered Order No. 55 permitting Plaintiffs to file and serve

amended complaints and summons making allegations against and naming and adding new defendants in this action. Pursuant to that order, Plaintiffs filed the Sixth Amended Consolidated Class Action Complaint on April 7, 2000 and the Supplemental Sixth Amended Complaint on June 13, 2000. Plaintiffs added Levett and Vincent as defendants in the Supplemental Sixth Amended Complaint. On August 23, 2000, Levett and Vincent filed the Motion to Dismiss at issue here.

## B. JURISDICTIONAL FACTS

### 1. Undisputed Facts

Levett and Vincent are citizens of the United Kingdom who have lived in Monaco since 1995 and 1996, respectively. They are both shareholders and former officers and directors of Winchester Commodities Group Limited ("Winchester"). At various times, they each served as officers and directors of some Winchester subsidiaries. In addition, Levett and Vincent each attended the annual Comex Copper Club Dinners in 1992 and 1994 in New York.

### 2. Plaintiffs' Averment of Facts

On or about May 20, 1991, Levett, Winchester, and CLR entered into a profit sharing agreement (the "Winchester–CLR joint venture"[1]) for the purpose of trading in non-ferrous metals on the London Metal Exchange (the "LME") and on New York's Comex. Pursuant to the profit sharing agreement, Winchester was the introducing broker, and CLR was the clearing broker for all clients introduced by Winchester. Vincent did not individually enter into the agreement at that time, because he was having problems with the Securities and Futures Authority ("SFA"), and the parties later agreed to delay any transfer of shares to Vincent for six months. On or around June 30, 1992, CLR made various changes to the profit sharing agreement, including requiring Levett and Vincent to each provide a personal guarantee of $500,000.00.

The Winchester–CLR profit sharing agreement provided that CLR was responsible for 20% of Winchester's losses, and CLR would receive 20% of Winchester's profits. Throughout the class period, Winchester submitted to CLR monthly management accounts analyzing Winchester's gross and net income. These reports establish that (1) the overwhelming majority of Winchester's brokerage income was generated by Defendant Hamanaka, code named AMOD, and (2) Levett and Vincent regularly sought reimbursement for their business travel to New York and to other locations in the United States. These reports indicate that Levett traveled to New York in July, 1994 and August, 1994 and to the United States in November, 1993, December, 1993, February, 1994, and August, 1994. These reports also indicate that Vincent traveled to New York in November, 1993, December, 1993, July, 1994, and October, 1995, to the United States in May, 1994 and July, 1994, to Memphis in July, 1994, and to Miami in October, 1995.

The Winchester–CLR joint venture agreed that CLR and Winchester Brokerage Limited, a subsidiary of Winchester, would "have a joint venture in the USA ... with a view to commence trading in January 1992." Affidavit of Gary S. Jacobson in Opposition to Motion to Dismiss for Lack of Personal Jurisdiction Ex. 2 [hereinafter Jacobson Aff.]. A Commodity Futures Trading Commission ("CFTC") form identifying special accounts filed on October 14, 1991 named Levett as the account executive for an account named Winchester Trading Limited, a subsidiary of Winchester, and named CLR as the relevant firm. A similar CFTC form filed

---

1. The parties dispute whether this profit sharing agreement created a joint venture, as defined by law. Although this Court uses the defined term, the "Winchester–CLR joint venture," this Court expresses no opinion regarding what legal entity, if any, resulted from the profit sharing agreement. A resolution of this issue is unnecessary for purposes of this motion.

on January 24, 1996 named Levett and Vincent as the persons controlling the Winchester Trading Limited account. The CFTC assigned Winchester Trading Limited a "Trader Code" on both forms.

At a Winchester–CLR joint venture management meeting held on July 18, 1991, the participants discussed a "Japan/America Trip," noting:

> Japan—As discussed the Far East trip was a great success. AL [Levett], CV [Vincent] and [Shinichi] Nishi visited all the potential Copper customers and appeared to be well received. . . .

> America—Again well received by all ongoing and future Clients. Several new trading relationships are in the process of being established particularly with Banks and Financial Institutions . . . .

> . . .

> AL [Levett] and CV [Vincent] feel sure that they will engage the best brokerage person in the U.S. by the end of August . . . .

Jacobson Aff. Ex. 4. At a later Winchester–CLR joint venture management meeting held on November 21, 1991, the participants noted: "USA Trip: AL [Levett]/CV [Vincent] reported that they had been well received and prospects for business looked good." Jacobson Aff. Ex. 5. At the February, 18, 1992 management meeting, Levett and Vincent reported on their business development trip to the United States and their attendance at the annual Comex Copper Club Dinner in New York.

Levett and Vincent worked with CLR to create, structure, and finance a series of transactions in June, 1993, referred to as the RADR transaction, in order to generate an immediate $50 million payment to the Winchester–CLR joint venture and to artificially inflate copper futures prices. In late May, 1993, Roy Leighton of CLR ("Leighton") met with Hamanaka in Tokyo to discuss the terms by which CLR would finance the RADR transaction. On June 3, 1993, CLR sent Hamanaka "a Terms of Business Letter for the proposed No. 2 account" informing Hamanaka that CLR, with Credit Lyonnais Paris's approval, had extended a special and additional credit line of $100 million to Hamanaka. Jacobson Aff. Ex. 10. In early June, 1993, Hamanaka communicated with Leighton and Philip Gamble of CLR ("Gamble") regarding negotiations for the No. 2 account taking place in New York between June 7 and June 10, 1993. On June 11, 1993, Leighton submitted to Hamanaka the planned RADR copper futures and options transactions, which were to be executed by Winchester Brokerage Limited in six stages and accepted by CLR in the No. 2 account.

The No. 2 account "was a general term used to describe sub-accounts MAGM1 and MAGM2." Jacobson Aff. Ex. 11. William Bradwell of CLR ("Bradwell") explained:

> The codes 'MAGM' and 'RADR' were proposed by Winchester Brokerage Limited for mutual use when referring to the Sumitomo Corporation and Winchester Trading Limited sub-accounts set up to record certain LME copper futures and OTC positions entered into on and after 24 June 1993—what later became referred to as the RADR transaction. In this respect, we recall that Winchester Brokerage Limited were [sic] concerned about maintaining confidentiality . . . . they did not want to use similar sub-account references to those already employed for other sub-accounts of Sumitomo and Winchester Trading. We are not certain why these specific mnemonics or codes were chosen, but they are often associated in the market place with Magma and Marc Rich, respectively. We assume Winchester thought that the use of the particular codes chosen would assist confidentiality.

Jacobson Aff. Ex. 11.

In September, 1993, Levett and Vincent advised Hamanaka to buy more copper exchange contracts in order to artificially support and manipulate prices. Levett and Vincent traveled with Leighton to

meet with Hamanaka to discuss how to maintain the manipulative RADR positions and artificially support prices. At the direction of Levett and Vincent, Winchester introduced and CLR held outright Comex positions for Sumitomo of 2229 contracts and 1696 warrants for a total of 3925 on September 1, 1993. On September 2, 1993, those holdings increased to 4974 contracts and 1916 warrants, for a total of 6890 lots. CLR held that total position of 6890 lots for Sumitomo through October 29, 1993. On September 17, 1993, CLR, per its own officers and Winchester, executed a contingency plan, effectively liquidating most parts of the June RADR transaction. Hamanaka effectively caused Sumitomo to pay out or be debited approximately $6 million in additional payments to CLR, for itself and Winchester, in connection with this contingency plan.

On or about January 4, 1994, Levett and Vincent caused a Winchester subsidiary in New Jersey to execute fraudulent transactions in connection with the unwinding of the manipulative RADR transaction. These transactions involved 3,220 lots (80,-500 tons) of three months copper for an approximate value of $140 million.

In February, 1994, Leighton and Hamanaka attended the annual Comex Copper Club activities in New York. They met "separate from the main activities of Copper Week," and discussed, among other things, CLR's financing of Sumitomo's copper trading. Jacobson Aff. Ex. 23.

In February, 1994, Levett and Vincent introduced CLR to Defendant Global Minerals and Metals Corporation ("Global") in New York. CLR issued a "terms of business letter" to Global on February 8, 1994, after Levett and Vincent caused Winchester Brokerage Limited to secure a guarantee of $250,000.00 on Global's behalf. In a letter dated January 10, 1995, Defendant Bipin Shah ("Shah"), a principal of Global, sought additional financing for copper transactions by forwarding Global's financial statement for 1994 to Vincent and requesting that Winchester increase Glob-

al's credit line to the maximum extent possible.

Levett and Vincent also caused Winchester to purchase large amounts of Comex futures contracts in 1995 and 1996, in order to artificially inflate Comex futures prices. As investigators from the CFTC and other exchanges examined the manipulators during 1996, the Defendants needed to take focused actions in order to reduce their LME long futures positions and appease the regulators, while continuing to artificially support and manipulate prices. In order to compensate for the reductions in Sumitomo's positions, Levett and Vincent caused Winchester Trading Limited to purchase large Comex copper futures contract long positions through another Winchester subsidiary, Winchester Holdings USA. Levett and Vincent caused Winchester Trading Limited to purchase more than 2,000 contracts by early January, 1996 and more than 4,000 contracts by February, 1996, and to continue to hold those contracts until at least March, 1996 when Sumitomo no longer needed to reduce its positions to appease the regulators. These positions, purchased on New York's Comex, called for delivery of more than three times the total copper stocks that were then held in Comex warehouses, and they had a significant upward effect on copper prices. On January 26, 1996, CLR expressed its concern over these Comex positions when Gamble spoke by telephone with Philip Bellanti of Winchester Trading Limited ("Bellanti") and pointed out the size of Winchester Trading Limited's March Comex copper position of 6000 lots, which "represented in excess of 20% of the open interest and substantially more of the fairly meagre stocks held by Comex." Jacobson Aff. Ex. 35.

In connection with these activities, Levett and Vincent traveled to New York and other locations in the United States frequently in late 1995. In October, 1995, Vincent's business costs for travel to New York and other locations in the United States was approximately £12,200 for trav-

el and currency and £26,300 for hire of aircraft. In addition, Winchester identified Levett and Vincent as the persons controlling the Winchester Trading Limited positions on a CFTC form identifying special accounts filed on January 24, 1996.

## II. *DISCUSSION*

A motion to dismiss under Rule 12 must be denied "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). For purposes of this motion, the factual allegations in the Complaints are accepted as true, and all inferences are drawn in favor of the pleader. *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1174 (2d Cir.1993) (McLaughlin, J.).

## A. PERSONAL JURISDICTION

Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure provides, "Service of a summons or filing a waiver of service is effective to establish jurisdiction over the person of a defendant (A) who could be subjected to the jurisdiction of a court of general jurisdiction in the state in which the district court is located."[2] Fed. R.Civ.P. 4(k)(1)(A). Levett and Vincent were served in Monaco pursuant to Rule 4(f) of the Federal Rules of Civil Procedure. Thus, this Court must look to New York's long-arm statute to determine whether this Court may exercise personal jurisdiction over Levett and Vincent. Fed. R.Civ.P. 4(k)(1)(A); *Bensusan Restaurant Corp. v. King,* 126 F.3d 25, 27 (2d Cir. 1997) (Van Graafeiland, J.); *PDK Labs, Inc. v. Friedlander,* 103 F.3d 1105, 1108 (2d Cir.1997) (Feinberg, J.). Since this

Court determines that it may exercise personal jurisdiction over Levett and Vincent pursuant to New York's long-arm statute, "the court then must decide whether such exercise comports with the requisites of due process." *Bensusan Restaurant Corp.,* 126 F.3d at 27. *See also Metropolitan Life Ins. Co. v. Robertson–Ceco Corp.,* 84 F.3d 560, 567 (2d Cir.1996) (Cabranes, J.), *cert. denied,* 519 U.S. 1006, 117 S.Ct. 508, 136 L.Ed.2d 398 (1996) *and* 519 U.S. 1007, 117 S.Ct. 508, 136 L.Ed.2d 398 (1996).

### 1. The Legal Standard

■ Plaintiffs bear the burden of establishing that this Court has personal jurisdiction over Levett and Vincent. *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez,* 171 F.3d 779, 784 (2d Cir.1999) (Sotomayor, J.). Plaintiffs'

obligation varies depending on the procedural posture of the litigation. Prior to discovery, a plaintiff challenged by a jurisdiction testing motion may defeat the motion by pleading in good faith, *see* Fed.R.Civ.P. 11, legally sufficient allegations of jurisdiction. At that preliminary stage, the plaintiff's *prima facie* showing may be established solely by allegations. After discovery, the plaintiff's *prima facie* showing, necessary to defeat a jurisdiction testing motion, must include an averment of facts that, if credited by the trier, would suffice to establish jurisdiction over the defendant. *Hoffritz for Cutlery, Inc. v. Amajac, Ltd.,* 763 F.2d [55], at 57; *Birmingham Fire Ins. Co. v. KOA Fire & Marine Ins. Co.,* 572 F.Supp. 962, 964 (S.D.N.Y. 1983). At that point, the *prima facie* showing must be factually supported.

*Ball v. Metallurgie Hoboken–Overpelt, S.A.,* 902 F.2d 194, 197 (2d Cir.1990) (New-

---

**2.** Rule 4(k)(1)(D) of the Federal Rules of Civil Procedure provides, "Service of a summons or filing a waiver of service is effective to establish jurisdiction over the person of a defendant (D) when authorized by a statute of the United States." Fed.R.Civ.P. 4(k)(1)(D). The parties dispute whether the RICO statute

provides for international service of process. This Court does not need to resolve this issue, because this Court may assert personal jurisdiction over Levett and Vincent under New York's long-arm statute and consistent with the Due Process Clause of the Fourteenth Amendment as discussed below.

man, J.). *See also Jazini v. Nissan Motor Co., Ltd.*, 148 F.3d 181, 184 (2d Cir.1998) (Friedman, J.) (quoting *Ball*, 902 F.2d at 197); *PDK Labs, Inc.*, 103 F.3d at 1108 (same); *Metropolitan Life Ins. Co.*, 84 F.3d at 566–67 (same). If "an evidentiary hearing is held, the plaintiff must demonstrate the court's personal jurisdiction over the defendant by a preponderance of the evidence." *Metropolitan Life Ins. Co.*, 84 F.3d at 567. Eventually, either at an evidentiary hearing or at trial, Plaintiffs must establish that this Court may exercise personal jurisdiction over Levett and Vincent by a preponderance of the evidence. *A.I. Trade Finance, Inc. v. Petra Bank*, 989 F.2d 76, 79–80 (2d Cir.1993) (Jacobs, J.).

Contrary to Defendants' contentions, Plaintiffs do not need to establish that this Court may exercise personal jurisdiction over Levett and Vincent by a preponderance of evidence at this time, because this Court has not held an evidentiary hearing. The parties, however, have engaged in extensive discovery thus far, but have not engaged in discovery specifically against Levett and Vincent. It is unclear whether Plaintiffs may make their prima facie showing of jurisdiction by merely making legally sufficient allegations of jurisdiction, or whether Plaintiffs must make a prima facie showing of jurisdiction that includes an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish personal jurisdiction over Levett and Vincent. As discussed below, Plaintiffs have met the higher burden. Thus, it is unnecessary for this Court to consider which burden is appropriate when a plaintiff has conducted extensive discovery, but has not engaged in discovery against the relevant defendant.

■ For purposes of this motion, this Court may rely on the allegations in the complaint and the affidavits submitted by the parties. *A.I. Trade Finance, Inc.*, 989 F.2d at 79. In evaluating Plaintiffs' prima facie showing of jurisdiction, this Court must construe all pleadings and affidavits in the light most favorable to Plaintiffs and

resolve all doubts in Plaintiffs' favor. *PDK Labs, Inc.*, 103 F.3d at 1108; *A.I. Trade Finance, Inc.*, 989 F.2d at 79–80. In addition, this Court should draw all inferences in favor of Plaintiffs. *IUE AFL–CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1052 (2d Cir.1993) (Oakes, J.).

## 2. New York's Long–Arm Statute

■ This Court has specific jurisdiction over Levett and Vincent pursuant to New York's long-arm statute, N.Y. C.P.L.R. 302(a) (McKinney 1990). N.Y. C.P.L.R. 302(a) provides:

As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent:

1. transacts any business within the state or contracts anywhere to supply goods or services in the state; or

2. commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act; or

3. commits a tortious act without the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if he . . .

(ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce . . . .

N.Y. C.P.L.R. 302(a) (McKinney 1990).

### a. *Agency Theory of Personal Jurisdiction*

N.Y. C.P.L.R. 302(a) provides that a court may exercise personal jurisdiction over a non-domiciliary defendant who meets certain requirements "in person or through an agent." N.Y. C.P.L.R. 302(a) (McKinney 1990). In *Kreutter v. McFadden Oil Corp.*, the New York Court of Appeals held that "the fiduciary shield rule

is not available to defeat jurisdiction under the New York long-arm statute." *Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 472, 522 N.E.2d 40, 47, 527 N.Y.S.2d 195, 202 (1988). Thus, "an out-of-state corporate officer who has not personally transacted business in New York, can still be subject to personal jurisdiction under § 302(a)(1) of New York's long-arm statute, if it can be shown that the corporation transacted business in New York as the officer's agent." *Karabu Corp. v. Gitner*, 16 F.Supp.2d 319, 323 (S.D.N.Y.1998) (Sotomayor, J.). *See also Retail Software Services, Inc. v. Lashlee*, 854 F.2d 18, 22 (2d Cir.1988) (Pratt, J.); *Kreutter*, 71 N.Y.2d at 467, 522 N.E.2d at 44, 527 N.Y.S.2d at 199 (1988). Although *Kreutter* and *Karabu Corp.* only discussed C.P.L.R. 302(a)(1), *Kreutter* made it clear that this agency theory of personal jurisdiction applies to the entire long-arm statute. *Kinetic Instruments, Inc. v. Lares*, 802 F.Supp. 976, 984 (S.D.N.Y.1992) (Sand, J.); *Kreutter*, 71 N.Y.2d at 468, 522 N.E.2d at 44, 527 N.Y.S.2d at 199. Further, this Court may exercise jurisdiction over a defendant who acted through an agent even if that defendant never physically entered New York. *Kreutter*, 71 N.Y.2d at 469, 522 N.E.2d at 45, 527 N.Y.S.2d at 200.

To establish that the out-of-state defendant acted through an agent, Plaintiffs do not need to establish a formal agency relationship between the defendant and his agent. *Karabu Corp.*, 16 F.Supp.2d at 323; *Kreutter*, 71 N.Y.2d at 467, 527 N.Y.S.2d at 199, 522 N.E.2d at 44. Plaintiffs need "only convince the court that [the agent] engaged in purposeful activities in this State in relation to [plaintiffs'] transaction for the benefit of and with the knowledge and consent of the [ ] defendants and that they exercise[d] some control over [the agent] in the matter." *Karabu Corp.*, 16 F.Supp.2d at 323 (quoting *Kreutter*, 71 N.Y.2d at 467, 527 N.Y.S.2d at 199, 522 N.E.2d at 44). Plaintiffs' allegations must "sufficiently detail the defendant's conduct so as to persuade a court that the defendant was a 'primary actor' in the specific matter in question; control cannot be shown based merely upon a defendant's title or position within the corporation, or upon conclusory allegations that the defendant controls the corporation." *Karabu Corp.*, 16 F.Supp.2d at 324. *See also Retail Software Services, Inc.*, 854 F.2d at 22.

In order to establish that Winchester Trading Limited served as Levett and Vincent's agent in New York, Plaintiffs must show that (1) Winchester Trading Limited engaged in purposeful activities in New York, (2) for the benefit of and with the knowledge and consent of Levett and Vincent, and (3) Levett and Vincent exercised some control over the corporation in that transaction.

First, Winchester Trading Limited engaged in purposeful activities in New York by trading copper on New York's Comex. For example, by January, 1996, Winchester Trading Limited had acquired and held a March Comex copper position of 6000 lots, which called for delivery of more than three times the total copper stocks that were then held in Comex warehouses.

Second, Levett and Vincent each knew of, consented to, and benefitted from these transactions and holdings. Levett and Vincent knew of and consented to these Comex activities, because they caused Winchester Trading Limited to acquire and hold the Comex copper positions. In addition, for purposes of this motion, this Court infers that Winchester and its subsidiaries, including Winchester Trading Limited, had no substantial wherewithal apart from Levett and Vincent, as demonstrated by (1) Levett's personally signing and entering into the Winchester–CLR joint venture agreement, and (2) CLR's requirement that Levett and Vincent each personally guarantee Winchester's credit line in the amount of $500,000.00. Thus, Levett and Vincent had a substantial financial stake in Winchester and its subsidiaries, and they would benefit from the financially successful Comex copper trad-

ing activities. Levett and Vincent also benefitted from these Comex activities, because they were meant to further the overall alleged conspiracy and had a significant upward effect on copper prices.

Finally, Levett and Vincent exercised some control over Winchester Trading Limited in these activities, because they caused Winchester Trading Limited to engage in these activities. In addition, the CFTC special accounts form filed on January 24, 1996 named Levett and Vincent as the persons controlling the trading in the Winchester Trading Limited account.

Plaintiffs sufficiently aver that Levett and Vincent were "primary actors" in causing Winchester Trading Limited to execute these copper trading activities on New York's Comex. Thus, this Court will consider allegations against Winchester Trading Limited, in relation to the 1996 copper trading activities, as Levett and Vincent's agent when applying New York's long-arm statute.

#### b. *N.Y. C.P.L.R. 302(a)(1)*

This Court may exercise personal jurisdiction over Levett or Vincent or both of them pursuant to C.P.L.R. 302(a)(1) if either or both of them, in person or through Winchester Trading Limited as his agent, transacted any business in New York that is substantially related to Plaintiffs' claims. N.Y. C.P.L.R. 302(a)(1) (McKinney 1990). The New York Court of Appeals explained that C.P.L.R. 302(a)(1) "is a 'single act statute' and proof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted." *Kreutter,* 71 N.Y.2d at 467, 522 N.E.2d at 43, 527 N.Y.S.2d at 198–99. *See also PDK Labs, Inc.,* 103 F.3d at 1109 (quoting *Kreutter,* 71 N.Y.2d at 467, 522 N.E.2d at 43, 527 N.Y.S.2d at 198–99.)

Plaintiffs sufficiently aver that Levett and Vincent each engaged in purposeful activity in New York to solicit, develop, and execute their allegedly manipulative copper trading activities from at least 1991 through 1996. Monthly management accounts establish that Levett traveled to New York to conduct business for the Winchester–CLR joint venture in July, 1994 and August, 1994. These reports also establish that Vincent traveled to New York to conduct business for the Winchester–CLR joint venture in November, 1993, December, 1993, July, 1994, and October, 1995. The purpose of the Winchester–CLR joint venture was to trade in nonferrous metals on the LME and New York's Comex. For purposes of this motion, this Court infers that Levett and Vincent were conducting business in New York related to trading on New York's Comex.

Levett and Vincent were also present in New York in February, 1992 to develop business for and to attend the annual Comex Copper Club Dinner for the Winchester–CLR joint venture. In February, 1994, Levett, Vincent, Leighton, and Hamanaka all attended the annual Comex Copper week. Leighton and Hamanaka met "separate from the main activities of Copper Week," and discussed, among other things, CLR's financing of Sumitomo's copper trading. Jacobson Aff. Ex. 23. It is reasonable to infer that Levett and Vincent also met with Leighton and Hamanaka while in New York, because Hamanaka generated the overwhelming majority of Winchester's income in connection with the Winchester–CLR joint venture, and Levett and Vincent had each provided a $500,000.00 personal guarantee of Winchester's credit line to CLR.

These business activities are substantially related to Plaintiffs' claims, because they were in furtherance of the alleged conspiracy, which is the basis of Plaintiffs' claims. Proof of one transaction in New York is sufficient to establish jurisdiction over Defendants, and Levett and Vincent each transacted business in New York at

least four times. Thus, this Court may assert personal jurisdiction over Levett and Vincent pursuant to N.Y. C.P.L.R. 302(a)(1).

Alternatively, this Court may exercise personal jurisdiction over Levett and Vincent, because they each transacted business in New York through their agent, Winchester Trading Limited. Plaintiffs sufficiently aver that Winchester Trading Limited traded copper on New York's Comex and held 6000 lots of copper in January, 1996, which "represented in excess of 20% of the open interest and substantially more of the fairly meagre stocks held by Comex." Jacobson Aff. Ex. 35. These holdings called for delivery of more than three times the total copper stocks that were then held in Comex warehouses. These transactions were necessary to appease regulators, while continuing to artificially support and manipulate prices. These activities are substantially related to Plaintiffs' claims, because they were in furtherance of the alleged conspiracy. This Court may exercise personal jurisdiction over Levett and Vincent pursuant to C.P.L.R. 302(a)(1), because through their agent Winchester Trading Limited, they transacted business on New York's Comex that is substantially related to the claims asserted.

c.  *N.Y. C.P.L.R. 302(a)(2)*

This Court may exercise personal jurisdiction over Levett or Vincent or both of them pursuant to C.P.L.R. 302(a)(2) if either or both of them, in person or through Winchester Trading Limited, committed a tortious act in New York. N.Y. C.P.L.R. 302(a)(2) (McKinney 1990). In order for a court to exercise personal jurisdiction pursuant to this subsection, the defendant's act or omission must have occurred in New York while the defendant was physically present in New York. *Bank Brussels Lambert*, 171 F.3d at 790 (quoting *Bensusan Restaurant Corp.*, 126 F.3d at 28; *Kramer v. Vogl*, 17 N.Y.2d 27, 31, 267 N.Y.S.2d 900, 215 N.E.2d 159 (1966)); *Feathers v. McLu-*

*cas*, 15 N.Y.2d 443, 209 N.E.2d 68, 261 N.Y.S.2d 8 (1965).

As discussed above, this Court infers that Levett and Vincent conducted business activities relating to trading on New York's Comex while on trips for the Winchester–CLR joint venture. In addition, Plaintiffs sufficiently aver that Levett and Vincent, through their agent Winchester Trading Limited, executed allegedly fraudulent copper trading activities on New York's Comex resulting in massive copper positions held by Winchester Trading Limited in January, 1996.

Plaintiffs allege that these activities were fraudulent, thus tortious. *Corcoran v. New York Power Auth.*, 202 F.3d 530, 536 (2d Cir.1999) (McLaughlin, J.) (discussing fraud as an intentional tort); *Simcuski v. Saeli*, 44 N.Y.2d 442, 451, 377 N.E.2d 713, 717, 406 N.Y.S.2d 259, 264 (1978) (same). These activities are substantially related to the claims asserted, because they were in furtherance of the alleged conspiracy to manipulate the copper market. In addition, the Comex trading activities occurred in New York while Levett and Vincent were physically in New York. Thus, this Court may exercise personal jurisdiction over Levett and Vincent pursuant to C.P.L.R. 302(a)(2).

■ Alternatively, this Court may exercise personal jurisdiction over Levett or Vincent or both of them pursuant to this section if one of their alleged co-conspirators committed a tort in New York. "It is well established that acts committed in New York by the co-conspirator of an out-of-state defendant pursuant to a conspiracy may subject the out-of-state defendant to jurisdiction under C.P.L.R. 302(a)(2)." *Chrysler Capital Corp. v. Century Power Corp.*, 778 F.Supp. 1260, 1266 (S.D.N.Y. 1991) (Patterson, J.). *See also Grove Press, Inc. v. Angleton*, 649 F.2d 121, 123 (2d Cir.1981) (Van Graafeiland, J.); *Laborers Local 17 Health and Benefit Fund v. Philip Morris, Inc.*, 26 F.Supp.2d 593, 601 (S.D.N.Y.1998) (Scheindlin, J.). To establish jurisdiction on this basis, Plaintiffs

must (1) make a prima facie factual showing of a conspiracy, and (2) allege specific facts warranting the inference that Defendants Levett or Vincent or both of them were members of the conspiracy. *Laborers Local 17 Health and Benefit Fund,* 26 F.Supp.2d at 601; *Chrysler Capital Corp.,* 778 F.Supp. at 1266. Plaintiffs "must also show that the defendant's co-conspirator committed a tortious act in New York." *Id.*

■ To make a prima facie factual showing of a conspiracy, "a plaintiff must allege the primary tort and four elements: (a) a corrupt agreement between two or more persons, (b) an overt act in furtherance of the agreement, (c) the parties' intentional participation in the furtherance of a plan or purpose, and (d) the resulting damage or injury." *Chrysler Capital Corp.,* 778 F.Supp. at 1267. *See also Kashi v. Gratsos,* 790 F.2d 1050, 1055 (2d Cir.1986) (Winter, J.). Through their Complaints, Plaintiffs have made sufficient allegations of the primary tort of fraud. *In re Sumitomo Copper Litig.,* 104 F.Supp.2d at 320.

■ Plaintiffs have satisfied the first requirement by alleging a corrupt agreement between Levett, Vincent, Hamanaka, Global, CLR, and other actors to manipulate and corner the market for physical copper and copper futures. Plaintiffs aver that Levett and Vincent caused Winchester to enter into the Winchester–CLR joint venture agreement, and that Levett personally entered into that agreement. Plaintiffs further aver that Levett and Vincent introduced CLR to the Global Defendants in February, 1994, and that thereafter, through meetings in New York, they developed a relationship with Global that led to increased activity with the Global Defendants to further their manipulative goals. CLR issued a "terms of business letter" to Global on February 8, 1994, after Levett and Vincent caused Winchester Brokerage Limited to secure a guarantee of $250,000.00 on Global's behalf. Thus, Plaintiffs sufficiently aver a corrupt agreement between Levett, Vincent, Winchester, CLR, and Global.

Plaintiffs have satisfied the second requirement by sufficiently averring several overt acts in furtherance of this agreement. Levett, Vincent, and CLR representatives held several Winchester–CLR joint venture management meetings, at which they planned a joint venture in the United States and other activities. Levett and Vincent traveled to the United States to solicit and conduct business for the Winchester–CLR joint venture. In addition, Levett and Vincent caused Winchester Brokerage Limited to secure a guarantee of $250,000.00 on Global's behalf, and thereafter, CLR issued a "terms of business letter" to Global on February 8, 1994.

Plaintiffs have also satisfied the third requirement by sufficiently averring that Levett, Vincent, and Global, one of their alleged co-conspirators, intentionally participated in the common plan to defraud. *Chrysler Capital Corp.,* 778 F.Supp. at 1268 (finding that allegations that the defendant knowingly participated in the agreement and knowingly assisted in its implementation were sufficient to satisfy the third requirement). As described above, Levett and Vincent personally took several intentional actions in furtherance of the conspiracy.

Plaintiffs have satisfied the fourth requirement by articulating that they were injured in their business or property or both. As a result of the conspiracy to defraud, Plaintiffs traded copper futures and options contracts on New York's Comex at artificial prices to their detriment. Thus, Plaintiffs have satisfied the first prong of the test by establishing a prima facie factual showing of a conspiracy.

In order to satisfy the second prong of the test, Plaintiffs must allege specific facts warranting the inference that Levett or Vincent or both of them were members of the alleged conspiracy. *Laborers Local 17 Health and Benefit Fund,* 26 F.Supp.2d at 601; *Chrysler Capital Corp.,* 778 F.Supp. at 1266. In order to make this

showing, Plaintiffs must show: "(1) that the out-of-state co-conspirator had an awareness of the effects of the activity in New York, (2) that the New York co-conspirators' activity was for the benefit of the out-of-state conspirators, and (3) that the co-conspirators in New York acted at the behest of or on behalf of, or under the control of the out-of-state conspirators." *Laborers Local 17 Health and Benefit Fund,* 26 F.Supp.2d at 602. *See also Grove Press, Inc.,* 649 F.2d at 122; *Chrysler Capital Corp.,* 778 F.Supp. at 1269. In essence, "a showing must be made that the alleged [co-conspirator] acted in New York for the benefit of, with the knowledge and consent of, and under some control by, the nonresident [conspirator]." *Grove Press, Inc.,* 649 F.2d at 122.

Plaintiffs have satisfied the second prong by demonstrating that Global acted in New York for the benefit of Levett and Vincent, with their knowledge and consent, and under some control by Levett and Vincent. Plaintiffs sufficiently aver that Levett and Vincent introduced CLR to the Global Defendants in February, 1994, and that thereafter, through meetings in New York, they developed a relationship which led to increased activity with the Global defendants to further their manipulative goals. CLR issued a "terms of business letter" to Global on February 8, 1994, after Levett and Vincent caused Winchester Brokerage Limited to secure a guarantee of $250,000.00 on Global's behalf. Levett and Campbell had lunch in New York City on January 23, 1995. In a letter dated January 10, 1995, Defendant Bipin Shah, a principal of Global, sought additional financing for copper transactions by forwarding Global's financial statement for 1994 to Vincent and requesting that Winchester increase Global's credit line to the maximum extent possible. Levett and Vincent benefitted from Global's activities in New York, because Global's activities furthered the alleged conspiracy's manipulative goals. This Court infers that Levett and Vincent had knowledge of the activities, consented to those activities, and had

some control over those activities, because Levett and Vincent, through Winchester Brokerage Limited, provided Global's credit line, and Global transacted business in New York for the Winchester–CLR joint venture.

Finally, Plaintiffs must also show that Levett and Vincent's co-conspirator, Global, committed a tortious act in New York. *Laborers Local 17 Health and Benefit Fund,* 26 F.Supp.2d at 601; *Chrysler Capital Corp.,* 778 F.Supp. at 1266. Plaintiffs allege that, for the purpose of creating an economic rationale for the large positions traded and held on the market, Global entered into fraudulent contracts with Sumitomo, although Hamanaka kept the fraudulent contracts off of Sumitomo's books and Sumitomo never signed the contracts. In New York, Global executed large, price-increasing purchases of copper futures contract long positions. Plaintiffs specifically aver that, as part of this conspiracy, Hamanaka directed Global as follows:

> *In addition to the above buying,* if we buy 50–70,000 MT **to make the market higher** probably price will go up 2480–2520 (we need higher high *at today's Comex closing* ). I think we have to buy some qnty Aug 3 morning again.
>
> **Please buy from 2410 or 2420 to push the mkt up.**

Sixth Amended Complaint ¶ 156 (emphasis in original). Thus, at Hamanaka's direction, Global entered fraudulent transactions designed to manipulate the price of copper on New York's Comex, and committed a tort in New York. For purposes of this motion, this Court infers that Levett, Vincent, Winchester, CLR, Global, Hamanaka, and others were members of a conspiracy, and that Global committed tortious acts in New York in furtherance of that conspiracy. Thus, this Court may exercise personal jurisdiction over Levett and Vincent under C.P.L.R. 302(a)(2) pursuant to a conspiracy theory of jurisdiction.

#### d. *N.Y. C.P.L.R. 302(a)(3)(ii)*

This Court may assert personal jurisdiction over Levett or Vincent or both of them pursuant to C.P.L.R. 302(a)(3)(ii) if either or both of them, in person or through Winchester Trading Limited, committed "a tortious act without the state causing injury to person or property within the state ... if he ... expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce ...." N.Y. C.P.L.R. 302(a)(3)(ii) (McKinney 1990). "The conferral of jurisdiction under this provision rests on five elements: First, that defendant committed a tortious act outside the state; second, that the cause of action arises from that act; third, that the act caused injury to a person or property within the State; fourth, that defendant expected or should reasonably have expected the act to have consequences in the State; and fifth, that defendant derived substantial revenue from interstate or international commerce." *LaMarca v. Pak–Mor Mfg. Co.*, 95 N.Y.2d 210, 214, 713 N.Y.S.2d 304, 735 N.E.2d 883 (2000).

█ Plaintiffs aver facts sufficient to establish the first two elements, and Defendants do not contest those elements. Plaintiffs also aver facts sufficient to satisfy the third element, that the injury occurred within New York. "In the case of fraud ... committed in another state, the critical question is thus where the first effect of the tort was located that ultimately produced the final economic injury." *Bank Brussels Lambert*, 171 F.3d at 792. Plaintiffs sufficiently aver that Levett and Vincent committed fraud in the United Kingdom, which had the effect of manipulating copper prices on New York's Comex. Thus, under the situs-of-injury test, the original event that caused the economic harm to Plaintiffs was the fraud conducted in the United Kingdom, and Plaintiffs' injury occurred in New York for C.P.L.R. 302(a)(3)(ii) purposes. *Id.*

Plaintiffs have also satisfied the fourth element. " 'The test of whether a defendant expects or should reasonably expect his act to have consequences within the State is an objective rather than subjective one.' " *Kernan v. Kurz–Hastings, Inc.*, 175 F.3d 236, 241 (2d Cir.1999) (Walker, J.) (quoting *Allen v. Auto Specialties Mfg. Co.*, 45 A.D.2d 331, 357 N.Y.S.2d 547, 550 (3d Dep't 1974)). Plaintiffs sufficiently aver that Levett and Vincent entered into the profit sharing agreement for the specific purpose of trading in non-ferrous metals on the LME and New York's Comex, and that Levett and Vincent purposefully engaged in activities related to copper trading on New York's Comex. Thus, Plaintiffs have satisfied the third element. *Kernan*, 175 F.3d at 241 (holding that an agreement to sell products in the United States, among other places, "was sufficient in and of itself to support a finding of " 'foreseeability ... coupled with a purposeful act' " for purposes of § 302(a)(3)(ii).")

Plaintiffs also aver facts sufficient to establish the fifth element. Contrary to Defendants' assertion, C.P.L.R. 302(a)(3)(ii) does not require Plaintiffs to allege that Defendants regularly engaged in business in New York. *LaMarca*, 95 N.Y.2d 210, 214, 713 N.Y.S.2d 304, 735 N.E.2d 883. The New York Court of Appeals explained that the fifth element "narrows the long-arm reach to preclude the exercise of jurisdiction over non-domiciliaries who might cause direct, foreseeable injury within the State but 'whose business operations are of local character.' " *Ingraham v. Carroll*, 90 N.Y.2d 592, 599, 665 N.Y.S.2d 10, 13, 687 N.E.2d 1293, 1296 (1997) (quoting the 12th Ann. Report of N.Y. Jud. Conf., at 342–43). *See also La-Marca*, 95 N.Y.2d 210, 214, 713 N.Y.S.2d 304, 735 N.E.2d 883 (quoting *Ingraham*, 90 N.Y.2d at 599, 665 N.Y.S.2d at 13, 687 N.E.2d at 1296). Plaintiffs allegations and averments of fact depict an international conspiracy to perpetrate fraud on the copper market and manipulate the price of copper, including copper traded on New

York's Comex and the LME. According to plaintiffs allegations and averments of fact, Levett and Vincent were based in London, but traveled frequently to Tokyo, New York, and other parts of the United States in order to further this conspiracy. Their operations were far from local in character; they were international in scope. Thus, this Court may exercise personal jurisdiction over Levett and Vincent pursuant to C.P.L.R. 302(a)(3)(ii).

### 3. Due Process

This Court may only assert personal jurisdiction over Levett or Vincent or both of them in compliance with the due process clause of the Fourteenth Amendment. "The Due Process Clause of the Fourteenth Amendment to the United States Constitution permits personal jurisdiction over a defendant in any State with which the defendant has 'certain minimum contacts ... such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice." ' " *Calder v. Jones,* 465 U.S. 783, 788, 104 S.Ct. 1482, 1486, 79 L.Ed.2d 804 (1984) (quoting *Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 342, 85 L.Ed. 278 (1940); *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945)). *See also Chew v. Dietrich,* 143 F.3d 24, 28 (2d Cir.1998) (Martin, J.) (quoting same).

### a. *Minimum Contacts*

"In judging minimum contacts, a court properly focuses on 'the relationship among the defendant, the forum, and the litigation.' " *Calder,* 465 U.S. at 788, 104 S.Ct. at 1486 (quoting *Shaffer v. Heitner,* 433 U.S. 186, 204, 97 S.Ct. 2569, 2579, 53 L.Ed.2d 683 (1977)). *See also Chew,* 143 F.3d at 28 (quoting same). "To establish the minimum contacts necessary to justify 'specific' jurisdiction, the [plaintiffs] first must show that their claim arises out of or relates to [defendants'] contacts with [New York]." *Chaiken v. VV Publ'g Corp.,* 119 F.3d 1018, 1027 (2d Cir.1997) (Leval, J.).

*See also Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414, 104 S.Ct. 1868, 1872, 80 L.Ed.2d 404 (1984); *Chew,* 143 F.3d at 28 (quoting *Chaiken,* 119 F.3d at 1027). Plaintiffs must also show that Defendants "purposefully availed" themselves of the privilege of doing business in New York and "could foresee being 'haled into court' there." *Chaiken,* 119 F.3d at 1027. *See also World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980); *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528 (1985); *Chew,* 143 F.3d at 28 (quoting *Chaiken,* 119 F.3d at 1027).

As explained above, Plaintiffs allege that Levett and Vincent engaged in a scheme to defraud the copper market, including copper traded on New York's Comex. Plaintiffs not only allege that Levett and Vincent should have known that their activity would have a significant impact upon New York's Comex, but that they actually intended that their activities significantly affect the New York based copper market. Levett and Vincent each have sufficient minimum contacts with New York, because "their intentional, and allegedly tortious, actions were expressly aimed at" New York. *Calder,* 465 U.S. at 789, 104 S.Ct. at 1487. *See also Global Intellicom, Inc. v. Thomson Kernaghan & Co.,* No. 99 Civ. 342(DLC), 1999 WL 544708, at *19 (S.D.N.Y. July 27, 1999) (Cote, J.) (holding that a Canadian defendant, who "played a key role in the allegations that various defendants formed a group to engage in improper short selling to depress the price of Global, whose stock traded at the time on a United States exchange and whose stock is registered under the Exchange Act," had sufficient minimum contacts with New York to permit the court's exercise of personal jurisdiction over him); *Andre Emmerich Gallery, Inc. v. Segre,* No. 96 Civ. 889(CSH), 1997 WL 672009, at *6 (S.D.N.Y. Oct.29, 1997) (Haight, J.) (holding that the defen-

dant knew his activity "would have a significant impact upon the New York-based art market. Thus, defendant's 'conduct and connection with the forum State are such that he should reasonably [have] anticipate[d] being haled into court here,'" and the exercise of personal jurisdiction did not violate the due process clause).

### b. *Traditional Notions of Fair Play and Substantial Justice*

If the requisite minimum contacts with New York are established, this Court must also consider "whether the assertion of jurisdiction 'comports with "traditional notions of fair play and substantial justice"— that is, whether it is reasonable under the circumstances of a particular case.'" *Chaiken*, 119 F.3d at 1027 (quoting *Metropolitan Life Ins. Co.*, 84 F.3d at 568; *International Shoe*, 326 U.S. at 316, 66 S.Ct. at 158). *See also Chew*, 143 F.3d at 28 (quoting *Chaiken*, 119 F.3d at 1027).

### i. Reasonableness

"While the exercise of jurisdiction is favored where the plaintiff has made a threshold showing of minimum contacts at the first stage of the inquiry, it may be defeated where the defendant presents 'a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'" *Metropolitan Life Ins. Co.*, 84 F.3d at 568 (quoting *Burger King*, 471 U.S. at 477, 105 S.Ct. at 2185). "Whether it is 'reasonable' to exercise jurisdiction in a particular case depends on '(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies.'" *Chaiken*, 119 F.3d at 1027 (quoting *Metropolitan Life Ins. Co.*, 84 F.3d at 568.) *See also Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102,

113–14, 107 S.Ct. 1026, 1032–33, 94 L.Ed.2d 92 (1987); *Burger King*, 471 U.S. at 475, 105 S.Ct. at 2184; *Chew*, 143 F.3d at 28 (quoting *Chaiken*, 119 F.3d at 1027).

Defendants argue that exercise of personal jurisdiction over them is unreasonable. First, they argue that the burden on Levett and Vincent weighs heavily against the exercise of jurisdiction, because they are not present in New York, they have not participated in this case since September 30, 1997, and they are not prepared for upcoming trial. Defendants "have offered no evidence to support an argument that this general burden [of litigating in a foreign forum] presents any particular hardship to either of them." *SEC v. Euro Security Fund*, No. 98 Civ. 7347(DLC), 1999 WL 76801, at *4 (S.D.N.Y. Feb.17, 1999) (Cote, J.). Their burden is not so onerous as to make this Court's exercise of personal jurisdiction over Defendants unreasonable and violative of the due process clause. *See Whitaker v. Fresno Telsat, Inc.*, 87 F.Supp.2d 227, 233 n. 6 (S.D.N.Y. 1999) (Scheindlin, J.) (noting that "[t]his burden may be less onerous if one considers that [the defendant] could have and should have reasonably foreseen that its actions would have consequences in New York."). In addition, Defendants have not been prejudiced by not participating in this action between September 30, 1997 and June 13, 2000. Defendants' assertion that they are not prepared for upcoming trial is also not persuasive, because the parties stipulated and this Court ordered that trial of the claims against the CL defendants will be conducted separately from the trial of the claims against Defendants Levett, Vincent, and Nishi. Order No. 87. Defendants' burden is no greater than any other defendant's burden of preparing for trial.

Defendants urge this Court to find that New York does not have an interest in adjudicating the case, and that Plaintiffs' have no interest in obtaining convenient and effective relief. This Court, however, finds that "New York and the United States have an interest in protecting their

residents from overseas fraud and ensuring the integrity of the commodities markets." *ACLI Int'l Commodity Serv., Inc. v. Banque Populaire Suisse*, 652 F.Supp. 1289, 1299 (S.D.N.Y.1987) (Lasker, J.). Thus, the forum state has a strong interest in adjudicating this case. In addition, this Court will not draw the inference that plaintiffs have no interest in obtaining convenient and effective relief based solely on their voluntary dismissal, without prejudice, of Defendants Levett and Vincent between September, 1997 and June, 2000. Plaintiffs have an interest in adjudicating their claims against all of the alleged members of the conspiracy to perpetrate fraud on the copper market in one action.

"The fourth and fifth factors are not significant in deciding this issue of jurisdiction over a foreign national." *SEC v. Roor*, No. 99 Civ. 3372(JSM), 1999 WL 553823, at *1 (S.D.N.Y. July 29, 1999) (Martin, J.). Considering all of the factors, Defendants have not presented a compelling case that this Court's exercise of personal jurisdiction over them would be unreasonable.

### ii. Relatedness

Plaintiffs must show that their claims arose out of or relate to Levett and Vincent's contacts with New York to establish minimum contacts necessary to justify specific jurisdiction. *Chew*, 143 F.3d at 28; *Chaiken*, 119 F.3d at 1027. *See also Helicopteros Nacionales de Colombia, S.A.*, 466 U.S. at 414, 104 S.Ct. at 1872. The "relatedness test is but a part of a general inquiry which is designed to determine whether the exercise of personal jurisdiction in a particular case does or does not offend 'traditional notions of fair play and substantial justice.'" *Chew*, 143 F.3d at 29 (quoting *International Shoe*, 326 U.S. at 316, 66 S.Ct. at 158). The relatedness analysis "involves a consideration of 'the relationship among the defendant, the forum, and the litigation.'" *Id.* (quoting *Shaffer*, 433 U.S. at 204, 97 S.Ct. at 2579). "Where the defendant has had only limited contacts with the state it may be appropriate to say that he will be subject to suit in that state only if the plaintiff's injury was proximately caused by those contacts. *See Gelfand v. Tanner Motor Tours, Ltd.*, 339 F.2d 317, 321–22 (2d Cir.1964). Where the defendant's contacts with the jurisdiction that relate to the cause of action are more substantial, however, it is not unreasonable to say that the defendant is subject to personal jurisdiction even though the acts within the state are not the proximate cause of the plaintiff's injury." *Id.*

Plaintiffs argue that "Vincent and Levett made ongoing and purposeful contact with New York in furtherance of the manipulative conspiracy, and directed much of that activity to Comex copper trades." Plaintiffs' Memorandum of Law in Opposition to the Motion of Defendants Ashley M. Levett and Charles A.M. Vincent to Dismiss the Complaint at 30 [hereinafter Pls.' Mem.]. Plaintiffs' claims arise out of Levett and Vincent's New York contacts, which indirectly and directly furthered the conspiracy to manipulate the Comex copper market. Thus, this Court may assert personal jurisdiction over Levett and Vincent without offending traditional notions of fair play and substantial justice.

### B. RULES 15 AND 21

On December 10, 1998, this Court entered an order which provided, "plaintiffs may file and serve amended complaints and summons making allegations against and naming and adding new persons as additional defendants in this action." Order No. 55. Pursuant to that order, Plaintiffs filed the Complaints. Defendants now argue that Plaintiffs violated that order by filing the Complaints after December 31, 1998. Order No. 55 on its face, however, did not specify that Plaintiffs had to file the amended complaints making allegations against and adding defendants before December 31, 1998. *City of Hartford v. Chase*, 942 F.2d 130, 134–35 (2d Cir.1991) (Oakes, J) (holding that courts should construe orders to give effect to

their plain meaning). Thus, Plaintiffs did not violate this Court's Order No. 55.

Defendants also argue that Plaintiffs violated Rules 15 and 21 of the Federal Rules of Civil Procedure. According to Rules 15(a), 15(d) and 21, a party seeking to amend a pleading, serve a supplemental pleading, or add parties to a case must make a motion seeking leave of the Court to make these changes. Fed.R.Civ.P. 15(a), 15(d), 21. Plaintiffs, however, did obtain leave of this Court to file amended complaints making allegations against and naming and adding new defendants in this action. Defendants arguments that this Court should now deny Plaintiffs' motion for leave to file amended complaints are untimely.

In addition, the fact that Plaintiffs' sought this Court's leave to file a Seventh Amended Complaint does not support Defendants' argument. In Order No. 55, this Court permitted Plaintiffs to file amended complaints making allegations against and naming and adding new defendants. Order No. 55 did not permit Plaintiffs to add a new legal theory to their complaint, as Plaintiffs sought to do in their Seventh Amended Complaint.

## C. STATUTE OF LIMITATIONS

Defendants argue that the statute of limitations is a complete defense to the Plaintiffs' claims set forth in the Complaints.[3] They argue that Plaintiffs' RICO and fraud claims accrued more than six years before the filing of the Complaints.

### 1. The Legal Standard

■ This Court discussed the proper legal standard for evaluating Defendants' arguments that Plaintiffs' civil RICO claims are barred by the statute of limita-

tions in its earlier decision, *In re Sumitomo Copper Litig.*, 104 F.Supp.2d 314, 322 (2000) (Pollack, J.). As explained therein, civil RICO claims are subject to a four-year statute of limitations, which begins to run when a plaintiff knew or should have know of his injury. *Rotella v. Wood,* 528 U.S. 549, ――, 120 S.Ct. 1075, 1080, 145 L.Ed.2d 1047 (2000); *Agency Holding Corp. v. Malley–Duff & Assoc., Inc.,* 483 U.S. 143, 156, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987). Although the Supreme Court eliminated the injury and pattern discovery rule, the Court held that "where a pattern remains obscure in the face of a plaintiff's diligence in seeking to identify it, equitable tolling may be one answer to the plaintiff's difficulty." *Rotella,* 528 U.S. at ――, 120 S.Ct. at 1084.

### 2. The Injury

The first step in the statute of limitations analysis is to determine when Plaintiffs sustained the alleged injury for which they seek redress. *Bankers Trust Co. v. Rhoades,* 859 F.2d 1096, 1102 (2d Cir.1988) (Pratt, J.). Plaintiffs allege that as a result of the alleged conspiracy and manipulative enterprise, Class members suffered economic injury from artificially high and noncompetitive copper prices throughout the Class Period, June 24, 1993 through June 15, 1996.

### 3. Inquiry or Actual Notice of Injury

The next step in the analysis is to determine when Plaintiffs discovered or should have discovered the injury, and begin the four-year statute of limitations period at that point. *Id.* Plaintiffs allege that they did not receive inquiry notice or learn of the factual basis for the alleged RICO violations and their alleged injuries suffered therefrom until June 14, 1996, when

**3.** Earlier in their Memorandum of Law, Defendants Levett and Vincent concede that the statute of limitations had not yet run on June 13, 2000: "At 8:25 p.m. on June 13, 2000, **literally minutes before the four-year statute of limitations was about to expire** on Plaintiffs' purported RICO claims, Plaintiffs filed in

the night deposit box at the Pearl Street Courthouse a pleading captioned 'Supplemental Sixth Amended Complaint.'" Defendants' Memorandum of Law in Support of Motion of Ashley M. Levett and Charles A.M. Vincent to Dismiss Plaintiffs' Sixth Amended and Supplemental Complaints at 7 (emphasis added).

Sumitomo first reported the uncommercial positions and losses, accompanied by details of the manipulation. Plaintiffs also allege that the CFTC did not begin to become aware of the material facts constituting the present claims until sometime in April, 1996, and that Comex did not issue any public statements addressing the manipulation of copper prices until after June 14, 1996. Levett and Vincent argue that this Court should find that Plaintiffs were on inquiry notice of their injuries as of April 1991, or at the latest October 11, 1993, when the LME took public action and various news reports appeared discussing manipulation of the copper market. Plaintiffs assert that despite any public notice, the statute of limitations should be tolled due to Defendants' fraudulent concealment of the alleged manipulative scheme.

### 4. Fraudulent Concealment as a Tolling Exception

The doctrine of fraudulent concealment was designed to prevent a party from "concealing a fraud, or ... committing a fraud in a manner that it concealed itself until such time as the party committing the fraud could plead the statute of limitations to protect it." *Hendrickson Brothers, Inc.*, 840 F.2d 1065, 1083 (2d Cir. 1988) (Kearse, J.) (quoting *Bailey v. Glover*, 88 U.S.(21 Wall.) 342, 349, 22 L.Ed. 636 (1874)). A "plaintiff may prove fraudulent concealment sufficient to toll the running of the statute of limitations if he establishes (1) that the defendant concealed from him the existence of his cause of action, (2) that he remained in ignorance of that cause of action until some point within four years of the commencement of his action, and (3) that his continuing ignorance was not attributable to lack of diligence on his part." *Hendrickson Brothers, Inc.*, 840 F.2d at 1083. *See also Butala v. Agashiwala*, 916 F.Supp. 314, 319 (S.D.N.Y.1996) (Koeltl, J.).

The "plaintiff may prove the concealment element by showing either that the defendant took affirmative steps to prevent the plaintiff's discovery of his claim or injury or that the wrong itself was of such a nature as to be self-concealing." *Hendrickson Brothers, Inc.*, 840 F.2d at 1083. *See also In re Nine West Shoes Antitrust Litig.*, 80 F.Supp.2d 181, 192 (S.D.N.Y.2000) (Parker, J.). Plaintiffs have established the first element by alleging that the conspiracy was self-concealing in nature. *Hendrickson Brothers, Inc., Id.* at 1084. *In re Nine West Shoes Antitrust Litig.*, 80 F.Supp.2d at 193. They argue that the wrong here was self-concealing in nature, and that Vincent, Levett, and the other defendants had to "conceal both that their bids for copper contracts were not commercial and that the resulting prices were inflated." Pls.' Mem. at 35–36. Thus, Plaintiffs do not need to demonstrate that any of the Defendants took affirmative acts of concealment to establish the first prong of fraudulent concealment. *Hendrickson Brothers, Inc.*, 840 F.2d at 1083; *In re Nine West Shoes Antitrust Litig.*, 80 F.Supp.2d at 192. In addition, Defendants' argument, that Plaintiffs must demonstrate affirmative acts of concealment by Levett and Vincent, is without merit. The cases cited by Defendants for this proposition do not support their argument, because they do not consider inherently self-concealing conduct.

For purposes of this motion, Plaintiffs have sufficiently established the second element of fraudulent concealment by alleging that they remained in ignorance of the cause of action until June 14, 1996. Defendants argue that Plaintiffs were on inquiry notice of their injuries as of April 1991, or at the latest October 11, 1993. "The question of constructive knowledge and inquiry notice may be one for the trier of fact and therefore ill-suited for determination on a motion to dismiss... Nonetheless, the test is an objective one and dismissal is appropriate when the facts from which knowledge may be imputed are clear from the pleadings and the public disclosures themselves." *Salinger v. Projectavision, Inc.*,

934 F.Supp. 1402, 1408 (S.D.N.Y.1996) (Koeltl, J.). *See also In re Merrill Lynch Ltd. Partnerships Litig.*, 154 F.3d 56, 59 (2d Cir.1998) (per curiam) (holding that the question of inquiry notice need not be left to a finder of fact.); *Dodds v. Cigna Sec., Inc.*, 12 F.3d 346, 352 n. 3 (2d Cir. 1993) (Winter, J.). This Court has previously held that "since issues of constructive knowledge depend on inferences drawn from the facts of each particular case, summary judgment is often inappropriate on issues of inquiry notice." *In re Sumitomo Copper Litig.*, 104 F.Supp.2d at 324. In fact, Southern District courts have variously described defendants' burden in this regard as "extraordinary" and appropriate only in "extreme circumstances." *In re Prudential Securities Inc. Ltd. Partnerships Litig.*, 930 F.Supp. 68, 76 (S.D.N.Y.1996) (Pollack, J.). This same logic extends to consideration of the issues of inquiry notice and fraudulent concealment with respect to motions to dismiss. Thus, Plaintiffs' allegations are sufficient to establish the second prong of fraudulent concealment for purposes of this motion.

Plaintiffs have also established the third element of fraudulent concealment by alleging that their continuing ignorance was not attributable to lack of diligence on their part. Plaintiffs claim that they were diligent in pursuing an investigation of the claims asserted here. Through no fault of their own, they did not receive inquiry notice nor learn of the factual basis for the RICO violations and plaintiffs' injuries suffered therefrom until June 14, 1996, when Sumitomo first reported the uncommercial positions and losses. Thus, this Court will not dismiss the Complaints on statute of limitations grounds.[4]

Defendants also argue that Plaintiffs' claims of New York common law fraud are barred by the statute of limitations. C.P.L.R. 213(8) provides for a six-year statute of limitations for common law fraud. The statute of limitations has been tolled by the doctrine of fraudulent concealment, as discussed above. Therefore, these claims are not barred by the statute of limitations.

So ordered.

---

**4.** Because the statute of limitations does not bar this action, this Court does not need to consider Defendants' argument that the statute of limitations was not tolled between June 19, 1996 and September 27, 1997, before this action was voluntarily dismissed against Levett and Vincent, without prejudice. In addi-

tion, this Court does not need to consider Defendants' argument that this Court should decline to exercise supplemental jurisdiction over the state law fraud claims, because this Court has jurisdiction over Plaintiffs' RICO claims.